Jane JOSEPH, et al., Plaintiffs,

v.

SHELL OIL COMPANY, et al., Defendants.

Court of Chancery of Delaware, In and For New Castle County.

Submitted: May 4, 1984.

Dated: May 8, 1984.

Revised: June 21, 1984.

Cover Page Revised: Aug. 8, 1984.

Joseph A. Rosenthal, Morris & Rosenthal, P.A., Wilmington, Del., Ralph L. Ellis, and Jill S. Abrams, Abbey & Ellis, Stephen Lowey, Lowey, Dannenberg & Knapp, P.C., Stanley Nemser, Lester L. Levy, and Stephen D. Oestreich, Wolf, Popper, Ross, Wolf & Jones, Harvey Greenfield, Sanford P. Dumain, Milberg, Weiss, Bershad, Specthrie & Lerach, and Daniel W. Krasner, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for plaintiffs.

R. Franklin Balotti, E. Norman Veasey, and Jesse A. Finkelstein, Richards, Layton & Finger, Wilmington, Del., for defendant-Shell Oil Co.

Richard L. Sutton, and William T. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and John R. Hupper, and Rory O. Millson, Cravath, Swaine & Moore, New York City, for defendant-SPNV Holdings, Inc.

HARTNETT, Vice Chancellor.

## I

This action is a consolidation of six actions brought as class actions on behalf of the shareholders of defendant Shell Oil Company ("Shell"), a Delaware corporation. The suit attacks a tender offer made by defendant SPNV Holdings, Inc. ("SPNV"), a Delaware corporation, which was formed for the purpose of obtaining the shares of stock of Shell owned by minority shareholders. The majority of Shell's outstanding common stock is controlled by defendant Royal Dutch Petroleum Company ("Royal Dutch"). The tender offer commenced on April 4, 1984, and will expire—unless extended—on May 9, 1984. The withdrawal date for the tender offer was April 24, 1984, and SPNV has commenced to purchase shares which have already been tendered.

Plaintiffs requested a preliminary injunction to enjoin the completion of the tender offer. It was heard by the Court on an expedited basis on Friday, May 4, 1984.

After considering all the facts and circumstances of this most unusual tender offer, I find that plaintiffs have shown the reasonable probability that the Court would find, after trial, that some of the defendants stand on both sides of the transaction and therefore have a fiduciary duty to the minority shareholders of Shell but that they have failed to meet the high standard of conduct imposed by Delaware law on fiduciaries and therefore, in the interests of the minority shareholders, the tender offer must be held in abeyance until the defendant SPNV makes further disclosures to the tender offerees and cures certain deficiencies.

## II

The underlying facts are not in dispute. Defendant Royal Dutch has, for over 60 years, controlled through various subsidiaries a majority of the stock of Shell. Royal Dutch now, through subsidiaries, controls 69.5% of the outstanding common shares of Shell. Shell is a corporation which is a major explorer for, producer and marketer of oil and oil products. It has 309 million shares of outstanding common stock held by more than 38,000 stockholders other than Royal Dutch. Its stock is traded on the New York Stock Exchange and elsewhere. Its assets consist of valuable oil reserves—some of which are considered as "proven reserves" and are therefore publicly disclosed on Shell's financial statements and some of which are considered as "probable reserves" and are therefore not disclosed publicly in Shell's public financial statements.

Shell has always been operated independently of Royal Dutch, but Royal Dutch has always selected Shell's directors and two directors are direct employees of Royal Dutch. The Chairman of the Board has always been a "Royal Dutch director". A majority of the directors (six) of Shell are outside directors with considerable background and experience as executives with other corporations.

Commencing in 1982 the Royal Dutch group began considering the acquisition of

the common shares of stock of Shell held by others—either by making a tender offer for the minority shares or through a freeze-out merger. In 1982 the Royal Dutch group retained Morgan Stanley & Co., Incorporated, ("Morgan Stanley"), a New York investment banker, to prepare an estimate of the value of the minority shares of Shell. No effort to acquire the minority shares took place at that time however.

Early in 1984 the Royal Dutch group again decided to attempt to acquire the minority shares of Shell and on January 16, 1984, Morgan Stanley was asked to update its valuation. This it did eight days later on January 24, 1984, and advised that the value of the minority shares, in its opinion, was $53 per share. The report of Morgan Stanley stated that its opinion of value was based only on publicly available information and Morgan Stanley was not furnished with any detailed information on the probable reserves except for general information as to their existence.

One of the subsidiaries used by the Royal Dutch group to control Shell is Shell Petroleum Company Limited ("Dutch Shell"), a Netherlands corporation. On January 24, 1984, Dutch Shell announced its intention to merge Shell into SPNV. Under the proposed merger the minority shares of Shell were to be cashed-out for $55 per share. Two days after the merger intention announcement, on January 26, 1984, Shell's fourth quarter earnings were reported which increased $1.42 per share (a 25% gain) over the same period of year previously. On January 23, 1984, the day preceding the Dutch Shell merger intention announcement, Shell announced that it had made an important major oil strike in the Beaufort Sea off of the shore of Alaska.

The Board of Directors of Shell, immediately after learning of the January 24, 1984, merger offer, created a special committee consisting of the six outside directors of Shell to evaluate the merger proposal. The committee undertook its work with vigor and retained Goldman-Sachs & Co. ("Goldman-Sachs"), a New York investment banker, to prepare an estimate of the value of the minority shares. The committee also retained several other consultants to assist it in evaluating the merger proposal and especially the value of the probable reserves. Goldman-Sachs was retained on the basis of a fixed fee plus a bonus to be based on any additional sums eventually paid for the minority shares. Goldman-Sachs arrived at a figure of $80–$85 per share as its estimate of the value of Shell's outstanding common stock.

The special committee met on March 26, 27, and 28, 1984, to consider the report of Goldman-Sachs and the other experts retained by the committee. On March 28, 1984, the committee considered the opinion of Goldman-Sachs that the liquidation value of the Shell shares was in the $80–$85 per share range.

Mr. Bookout, the President of Shell, opined in effect that, in his opinion, the shares might have a value of as much as $91 per share if Shell were sold as a going concern to a purchaser on an open auction basis and if all the possible contingencies upon which value is based were favorable to Shell.

The committee then unanimously rejected the $55 merger offer of Dutch Shell as being unacceptable and indicated that it would entertain a $75 per share offer. Goldman-Sachs also then expressed that $75 per share was in the lower range of what would be, in its opinion, a fair merger price offer. On March 29, 1984, the full Board of Directors of Shell approved the recommendation of the special committee.

The action of the committee and the Board was communicated to Royal Dutch. (Two members of the Shell Board are direct representatives of Royal Dutch.)

What transpired then is somewhat disputed. Plaintiffs claim that Royal Dutch flatly rejected any negotiations as to price. Royal Dutch claims that it was willing to negotiate as to price but that the spread between the parties was too great to con-

duct meaningful negotiations. In any event, no arms-length negotiations as to price ever took place.

On March 29, 1984, Royal Dutch announced that it had withdrawn its merger proposal and would commence a tender offer to the minority shareholders at $55 per share. On April 4, 1984, the offering circular for the tender offer raised the tender offer price to $58 per share. Shortly after the tender offer announcement the shares of Shell traded at $60 per share. Shortly before the tender offer the shares had traded at $57–$59 per share. Prior to the merger offer in January of 1984, the Shell stock had been selling for about $44 per share.

Dutch Shell also publicly announced that it would not make another public tender offer for 18 months and that it intended to eventually obtain all the shares of Shell. It disclosed that if it obtained 90% or more of the minority shares as a result of the tender offer, it would effectuate a short form merger to obtain the remainder of the shares. In such an eventuality, any dissenting shareholders, of course, would be relegated to relying on the Delaware appraisal statute for redress.

In the event that 90% of the shares of Shell were not tendered, Dutch Shell announced it might buy sufficient shares on the open market to reach the 90% figure needed to effectuate a short form merger. Dutch Shell also commenced to solicit acceptance of the tender offer by a telephone campaign. As part of this campaign, it has advised some Shell stockholders that after the tender offer is terminated, the Shell stock may well drop to its previous price of about $40 per share.

Plaintiffs view this scenario as being coercive to the minority stockholders of Shell. They further claim that defendants have a fiduciary duty to the minority stockholders and that this duty has been breached because the defendants have been guilty of unfair dealing with the minority and of offering an unfair price.

Defendants, however, maintain that they have been scrupulously fair and have not breached any fiduciary duty to the minority stockholders—either by unfair dealing or by offering an unfair price. In any event, they claim that under Delaware law they have no legal duty to offer a fair price and that they have complied with their acknowledged duty of fair dealing by making a full and complete disclosure of all the facts to the minority shareholders.

### III

It is elementary that defendants, because they stand on both sides of the transaction, are under a fiduciary duty to the minority stockholders of Shell. *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107 (1952); *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503 (1939); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983); *Singer v. Magnavox Co.*, Del.Supr., 380 A.2d 969 (1977). At trial, therefore, the burden of persuasion would fall upon the defendants. *Schreiber v. Bryan*, Del.Ch., 396 A.2d 512 (1978).

The present matter is before the Court, however, upon an application for a preliminary injunction and therefore plaintiffs have the burden of showing that there is a reasonable probability of their prevailing on the merits if a trial were held. *Gimbel v. Signal Companies*, Del.Ch., 316 A.2d 599 (1974).

From the evidence adduced by the discovery and affidavits I am convinced that the plaintiffs have met their burden of showing that there is a reasonable probability that the defendants have not offered a fair price for the shares of Shell held by the minority stockholders and that defendants have not made a full and complete disclosure of all pertinent facts with complete candor.

The question remains, however, whether these oversights are sufficient to justify the extraordinary remedy of a preliminary injunction.

## IV

Defendants vigorously argue that they have no legal duty to offer a fair price (although they also maintain that the price offered is fair). They argue that their only fiduciary duty as a majority stockholder making a tender offer is one of full disclosure. They cite the unreported case of *Lewis v. Fuqua Industries*, Del.Ch., C.A. No. 6534, Hartnett, V.C., 7 Del.J.Corp.L. 478 (1982) and *Lynch v. Vickers Energy Corp.*, Del.Ch., 351 A.2d 570 (1976), *rev'd. on other grounds*, Del.Supr., 383 A.2d 278 (1977), and *American Medicorp, Inc. v. Humana, Inc.*, Del.Ch., 381 A.2d 571 (1977), none of which cases, however, involved the unusual factual situation present here.

The rationale of the cases cited is that a stockholder is under no compulsion to accept a tender offer and can determine for himself if the offer is fair to him. The stockholder's option to accept or reject a tender offer is, of course, necessarily based on whether he has before him all the facts necessary to make an informed decision. *Lynch v. Vickers Energy Corp.*, supra.

While I agree with the general rule that a stockholder, if there has been a complete disclosure to him of all germane facts with complete candor, should be left free to make his own decision as to whether to tender or keep his shares, there are exceptions. One such exception is when the maker of a tender offer, who has a fiduciary duty to the offeree, structures the offer in such a way as to result in an unfair price being offered and the disclosures are unlikely to call the unwary stockholder's attention to the unfairness.

Here the tender offeror retained Morgan Stanley to render an opinion as to the fairness of the price to be offered. Obviously a primary purpose of the fairness opinion of Morgan Stanley was to convince the stockholders to whom the tender offer was to be made that the price offered was fair. To believe otherwise is unrealistic. The maker of the tender offer, however, withheld from Morgan Stanley essential facts necessary for Morgan Stanley to arrive at a fair and accurate opinion as to the value. The essential information withheld was any non-public information about the value of the probable oil reserves. It would defy reason to find that an oil exploration company such as Shell could be valued without any indepth inquiry into the estimated value of the probable oil reserves. Indeed, it is possible—although not probable—that the probable reserves may be the single most valuable asset of Shell.

Reasonable men can differ as to opinions as to value. Indeed, the Court is well aware that expert appraisers usually express different opinions as to value even when they use the same data for arriving at their opinion. And it is not unusual that an expert appraiser will express a higher value if he has been hired by the plaintiff than if he has been hired by the defendant.

The problem here is not that the value opinion of Goldman-Sachs is higher than the value opinion of Morgan Stanley—that is expected by sophisticated investors—but rather that Morgan Stanley was not even given the opportunity to examine and evaluate the data relating to the value of the probable reserves. This conduct falls short of the fiduciary duty owed to the stockholders of Shell by the maker of the tender offer. It shows a failure to make available to the appraiser hired by the offeror the essential information needed by the appraiser if his appraisal was to have any meaning. This would appear to be a breach of fiduciary duty aside from any issue of failure to make full disclosure.

In addition, the disclosures made to the stockholders failed to clearly and unequivocally disclose that essential and necessary information had been withheld from the appraiser. A disclosure to the effect that "Morgan Stanley based its opinion of value on publicly disclosed information" falls far short of the full and complete disclosure with absolute candor required by Delaware

law. *Lynch v. Vickers Energy Corp.*, supra.

This alone constitutes a breach of fiduciary duty and is probably adequate reason to impose sanctions upon some of the defendants. There are, however, other failures of full disclosure which appear in the record.

## V

A careful review of the tender offer materials shows that they do not satisfy the requirement of disclosure of all germane facts with complete candor as is required by Delaware law. *Lynch v. Vickers Energy Corp.*, supra. In *Vickers*, the Delaware Supreme Court held that a tender offer failed to disclose fully two critical facts, each of which fell short of the standard which requires a complete disclosure of all germane facts. The Court found that it was not disclosed that a "highly qualified" petroleum engineer, who was a member of the target company's management, had calculated the net asset value to be worth significantly more than the minimum amount disclosed in the offer. Furthermore, the Court held that there was a failure to state that the offeror's management had authorized open market purchase of the target's stock during the period preceding the $12 per share tender offer for bids up to $15 per share.

■ The failure to disclose with complete candor that Morgan Stanley was not given access to the data necessary to fully and completely evaluate the value of the probable oil reserves has been discussed previously. Defendants claim that there was an adequate disclosure of the valuation of the probable reserves by Morgan Stanley because Morgan Stanley did assign a value to the probable reserves. It is clear, however, that Morgan Stanley did not explicitly state a value for the probable reserves and it is unlikely that they ascribed very much value to them. It certainly did not expressly state that it did not have available to it all the data necessary to make an informed judgment as to the value of the probable reserves. The fact that Shell in its 14–D–9 Schedule filed with the SEC did reveal certain data concerning the value of the probable reserves does not relieve the tender offeror from meeting its duty of full disclosure.

■ There also has been no disclosure of the fact that some of Shell's management made estimates of value based on a going concern basis of $91 per share. I find this to be a germane fact that a stockholder would deem relevant in making his decision. SPNV cannot meet its duty by claiming that the plaintiffs cannot prove that SPNV knew about the $91 figure. Two of the directors of Shell are employees of Royal Dutch and they most certainly knew, or should have known, of the management's opinion as to value. SPNV and its investment advisor never made a request for Shell management's in-house evaluation when it is clear that they should have made inquiry. As evidenced by the comment of Mr. Van Wachem of the Royal Dutch group:

"... we find it difficult to believe that any outsider, no matter how competent, could improve upon the evaluation of oil and gas reserves made by the professional Shell Oil staff over a substantial period of time in the regular course of their business."

■ Defendants argue that Shell's 14–D–9 Schedule as filed with the SEC, which reflected that there had been expressions of values ranging from $77 to $152 should be considered a part of the materials available to the stockholders concerning this tender offer and those disclosures therefore cure the failure of the tender offer materials to disclose the existence of the $91 per share valuation opinion. This argument also falls short. The $91 figure, calculated in response to a request from the special committee, is surely a relevant figure. The duty to disclose it cannot be fulfilled by mere reliance on a general expression of value. A similar argument was made and rejected in *Lynch v. Vickers,*

supra. In that case, the defendants asserted that they discharged a duty to disclose specific estimates by disclosing that the target company's net asset value was "not less than $200,000,000 ... and could be more." Justice Duffy replied to that argument by stating, "Technically speaking, the language may be accurate; but that kind of generality is hardly a substitute for hard facts when the law requires complete candor."

■ The failure to fully disclose the recent discoveries in the Beaufort Sea is also troublesome. The deposition testimony of Mr. Fiedorek of Morgan Stanley stated that Morgan Stanley did not include the value of that discovery in connection with the fairness opinion of April 3, 1984. Basically, it was his opinion that the discovery was too recent, the equity market had not had time to react, and it had not yet been proven that the discovery was significant. He concluded that, "Based on these factors and discussions with Mr. Good, who is the Morgan Stanley oil and gas reserves analyst and is extremely knowledgeable in the industry generally, and specifically in the area where the Beaufort Sea discovery is located, we were of the view that it did not have present material effect on the value of Shell, and hence, the Beaufort Sea discovery was among those factors considered and was included in the subsequent fairness opinions of March 29 and April 3." Hence, he stated, no amount of value was added because of the Beaufort Sea discovery. However, from a review of an exhibit placed in evidence by the plaintiffs, it is apparent that Mr. Good, Morgan Stanley's own expert analyst, did ascribe a value to the discovery in what appears to be an inter-office memorandum to a F.B. Whittemore (copy to B.D. Fiedorek) on January 23, 1984. His estimate was that Shell's incremental increase per share because of the discovery would be $3.90. Although this is an estimate, it is certainly relevant and material to an indecisive shareholder. While the testing at the Beaufort Sea is incomplete, the presence of oil has been confirmed. Furthermore, there was enough time to include the estimate from Shell's specialist in the Beaufort Sea area in the tender offer circular or to at least have mentioned the potential value the discovery had.

■ Lastly, the failure of the tender offer materials to completely and with utmost candor make clear that the initial valuation opinion of Morgan Stanley was arrived at after only eight days of scrutiny violates the rule set forth in *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983). The fact that Morgan Stanley had prepared a similar preliminary report in 1982 does not relieve the tender offeror from fully disclosing the circumstances surrounding the presentation of Morgan Stanley's fairness opinion.

■ In summary, it may be that each of the failures to disclose, as discussed above, standing alone might not be of great importance to a stockholder asked to decide whether to tender or hold his shares. When, however, they are all considered together and are also considered against the factual background of this transaction, it is clear that the tender offeror has not met its duty of disclosure under Delaware law.

### VI

■ I reject plaintiffs' argument that the tender offeror's failure to negotiate the price in an arms-length manner violates the rule of law announced in *Weinberger v. UOP, Inc.,* supra. *Weinberger* involved a freeze-out merger—not a tender offer. In *Weinberger* the Court merely indicated that an arms-length negotiation was desirable. Of course, if arms-length negotiations took place it would be powerful evidence that the price arrived at was fair. Cf. *Getty Oil Co. v. Skelly Oil Co.,* Del.Supr., 267 A.2d 883 (1970). But the failure to arrive at the price by arms-length negotiations does not *ipso facto* indicate an unfair price. It is but one factor to be considered.

## VII

Having found that the plaintiffs have shown the reasonable probability that some of the defendants have breached a fiduciary duty, it is now necessary to consider whether there exists the reasonable probability of irreparable harm. *Gimbel v. Signal Companies, Inc.*, Del.Ch., 316 A.2d 599 (1974).

■ To permit the minority stockholders of Shell to decide to tender their shares without the omissions of the defendants being cured might forever deny to those tendering stockholders their right to be treated fairly. This would constitute such harm as could not easily be unscrambled and is therefore irreparable.

## VIII

In my holdings I have not substituted my judgment of the fairness of the tender offer price for the opinion of the ultimate finder—the stockholder. It is likely that both the opinions of Morgan Stanley and of Goldman-Sachs leave something to be desired. Morgan Stanley's inability to judge the value of the probable reserves because of the lack of information, the shortness of time in the preparation of its update report, its quick and cursory reaffirmation of its opinion as to value after the fourth quarter earnings were announced, and after the announcement of the Alaskan oil discovery, all tend to diminish the impact of its opinion.

Likewise, the over-reliance by Goldman-Sachs on a liquidation analysis, its questionable methodology, and the uncertainty of its opinion, also leave something to be desired.

And as in all appraisals, the impartiality of the appraiser is always open to evaluation.

What I have found is that Morgan Stanley was prevented from doing the job for which it was hired because of the failure of the tender offeror to make available to it the data which it needed to prepare a valid fairness opinion. I have also found that certain germane facts were not disclosed to the minority stockholders which they should have been given, considering all the facts and circumstances present here, if they are to have a fair opportunity to make an informed judgment as to the fairness of the tender offer.

## IX

Finally to be considered is the remedy to be granted. Only defendants Shell and SPNV are presently before the Court. Plaintiffs have not shown any basis for a preliminary injunction to be entered against Shell and therefore any relief granted must be as to SPNV.

■ This Court, as the court of equity, has broad discretionary powers to grant or withhold a preliminary injunction, *Bayard v. Martin*, Del.Supr., 101 A.2d 329 (1953), and to structure a remedy which will be as fair as possible to all the competing interests. *Guarantee Bank v. Magness Construction Co.*, Del.Supr., 462 A.2d 405 (1983).

In fashioning an appropriate remedy for this stage of the proceeding, I must balance several considerations. The plaintiffs have convinced me that it is reasonably probable that the tender price is too low because it probably does not reflect the full value of the probable reserves. The record also shows that Goldman-Sachs found that the value of these reserves, when examined in depth, would only add—at a maximum—an additional $4 per share to the value of Shell's shares.

On the other hand the record also shows that Morgan Stanley did ascribe a value to the probable oil reserves, although it did so without an indepth analysis of their potential and did not ascribe an explicit value.

Although the tender offer price is probably below the true value of the shares and is certainly below the liquidation value of the shares if all the stock of the company were offered for sale on an open bid basis, the facts are that all the shares will never be so offered. Obviously the fact as to the

ownership of the majority of the outstanding shares by the Royal Dutch group precludes that a value equal to the liquidation value will ever be reached in the market place. The liquidation value—whatever it may be—must therefore be discounted by a stockholder who is considering whether to tender. How much of a discount is for each investor to decide for himself—but only after he has been given all the facts.

The Court is mindful that some stockholders of Shell have probably considered selling their shares at $44—or even $40—per share and the tender offer price of $58 is considered to be a windfall. Their rights must be considered.

Other stockholders, who may believe that the value of Shell stock is more than the $58 per share offered, may desire to weigh this against the fact that it may be many years before a higher price is available to them and they may desire to consider that it is not unlikely that upon termination of the tender offer the stock will drop to near its pre-tender offer price.

Other stockholders may believe that the tender offer price is greater than the fair value of stock because the tender offer does represent a 32% premium over the reputed closing price on the day before the public announcement of the initial proposal of SPNV to acquire the minority shares and because they, with some justification, must discount the opinion of Goldman-Sachs which has a stake in the outcome and is most certainly not impartial.

 Plaintiffs seek to permanently enjoin what they term to be the freeze-out of the minority stockholders. To grant such relief would be overbroad, might not be consistent with investment desires of many stockholders, and would prohibit a tender offer being made by the majority stockholder which is permitted under Delaware law if done properly.

 It would be impossible to imagine all the different reasons a particular stockholder might have for deciding to tender or not to tender shares in response to the tender offer. The best way to attempt to reconcile and at least partially protect the many different interests and investment desires of the minority stockholders and still maintain the duty of the Court to prevent breaches of fiduciary duty is to hold the completion of the tender offer in abeyance, to require Morgan Stanley to review in good faith the data developed by the independent committee and to again express their opinion as to value after such review and to disclose by supplemental notices the information which I have found should have been disclosed. Those stockholders who have tendered must be given an opportunity to withdraw their shares, if they desire, after the supplemental disclosure is made.

The need to promptly comply with this ruling is obvious. Counsel shall be expected to promptly confer and submit a proposed order.

Needless to say, I have not commented on all the many arguments made by the parties, some of which are obviously not relevant. I also have had to summarize or only briefly touch on other allegations or arguments but the constraints of time permitted no more.

I also note that the mere compliance with the mandate of this opinion will not end this matter. The other remedies for the defendants' apparent breach of their fiduciary duties, however, must await another day.