OPINION OF THE COURT
David B. Saxe, J.
This application for injunctive relief provides this court with the opportunity to review the law applicable to enjoining a corporate take-over.
Ausimont N.V. (Ausimont) is a Netherlands corporation whose common stock is traded on the New York Stock Exchange. Defendant Montedison S.p.A. (Montedison) is an Ital *74 ian company which currently owns 72.6% of Ausimont’s shares, and which from Ausimont’s inception has been its majority shareholder. Montedison now seeks, by tender offer, to purchase all the outstanding shares of Ausimont. The plaintiffs are minority shareholders of Ausimont, who have commenced this action by order to show cause seeking to enjoin Montedison from proceeding with the tender offer for Ausimont’s publicly held shares. They challenge the sufficiency and propriety of the tender offer circular dated January 20, 1989 by which Montedison offers to purchase the shares at a price of $35. The plaintiffs claim that the offering price is grossly inadequate, that the tender offer circular is materially deficient, and moreover that the circular is structured so as to coerce the minority shareholders to tender their shares at an inadequate price.
The essential history behind the offer is basically undisputed. On September 28, 1988 Montedison proposed to Ausimont’s board of directors a negotiated transaction by which Montedison would acquire all Ausimont’s common stock at a price of $33.50 per share. In response, on October 4, 1988, Ausimont’s board of directors established a "special committee” of four independent board members, which commissioned two financial analysts as advisors to evaluate the offer. Those advisors concluded that the $33.50 price was inadequate and the special committee rejected the offer. At a follow-up meeting on December 3, 1988 Montedison increased its offer to $35 per share, which the special committee also rejected as inadequate.
Rather than negotiate further with the special committee, on January 20, 1989 Montedison launched the challenged tender offer for the price rejected by the committee, $35 per share.
The tender offer circular sets forth the variables considered and the valuation estimates made on behalf of Montedison by financial analyst Morgan Stanley & Co. (Morgan Stanley) regarding the estimated value of Ausimont’s shares under various circumstances. The different possible scenarios considered resulted in estimates ranging from the "low $20s” per share to a high of $46 per share (if the company were sold as a whole or in parts to a strategic buyer).
The circular also contains much additional information, such as the fact that Montedison intends to acquire the elastomers division of Ausimont’s subsidiary, Dutral S.p.A. (Dutral), and that it has agreed to contribute Dutral’s elasto *75 mers division to a joint venture between Montedison and the Italian state-owned energy company, Ente Nazionale Idrocarburi (ENI).
The circular further informs minority shareholders that should Montedison acquire at least 95% of Ausimont’s common stock, it intends to commence a procedure available under Dutch law whereby a Dutch court will set a nonappealable transfer price for which price the remaining shares will automatically be transferred to the majority owner.
The plaintiffs challenge this tender offer on several grounds and contend that the offer must be enjoined to prevent irreparable harm to the minority shareholders. Their arguments develop as follows: (1) The price offered by the defendant is grossly inadequate; (2) By including in the circular the information that Montedison hopes to invoke the automatic transfer proceeding available under Dutch law, the circular will have a coercive effect on minority shareholders. They reason that shareholders will feel compelled to tender since if they do not and if Montedison obtains 95% of the shares, their shares will be rendered unmarketable and thus valueless during the period in which the Dutch court evaluates their shares, a period which may extend up to or beyond 18 months; (3) The plaintiffs allege that in several respects the circular omits material information that minority shareholders must have in order to evaluate the adequacy of the offer. For instance, they contend that Montedison should have included the special committee’s reasons for rejecting the $35 offer, should have explained how Morgan Stanley arrived at its evaluation of each individual asset owned by Ausimont, and in particular should have elaborated on the value of Dutral, Ausimont’s subsidiary, to Montedison.
On the strength of these contentions and the supporting documentary submissions, the plaintiffs seek a preliminary injunction staying the tender offer. To obtain a preliminary injunction, the movant must demonstrate (1) the likelihood of ultimate success on the merits, (2) irreparable injury absent the injunctive relief, and (3) a balancing of the equities (Albini v Solork Assocs., 37 AD2d 835). The court’s consideration will therefore focus first on the merits of the plaintiffs’ contentions.
DUTY OF FAIR PRICE
The conduct of a majority shareholder vis-á-vis the *76 minority shareholders must be judged in accordance with the law applied in its place of incorporation (see, Hart v General Motors Corp., 129 AD2d 179, 183). As mentioned previously, Ausimont is incorporated in the Netherlands. Consequently, Dutch law must be applied as a measuring standard to the conduct of the majority shareholder of Ausimont.
The plaintiffs, however, do not offer, from either Dutch case law or statute any such measuring standard; rather, their arguments in this regard are derived from an amalgam of standards enunciated under the case law of Delaware and New York. Upon this basis the plaintiffs advance a standard which includes a duty to offer a fair price. On the other hand, the defendants have submitted an uncontroverted expert’s affidavit which explains that neither Dutch statutory law nor Dutch case law imposes on a majority shareholder a duty to offer a fair price in a tender offer for the purchase of minority owned shares. Rather, Dutch law imposes simply a duty of reasonableness and fairness (Dutch Civ Code arts 7, 8). Indeed, the prospectus filed with the SEC by Ausimont’s predecessor, Ausimont Compo, N.V., specifically advises prospective shareholders that
"Under United States law, majority and controlling shareholders generally have certain fiduciary responsibilities to minority shareholders. The law of The Netherlands protecting the interests of minority shareholders may not be as protective in all circumstances as the law protecting minority shareholders in United States jurisdictions. * * *
"A shareholder of a Netherlands company cannot sue its directors derivatively (i.e. in the name of and for the benefit of the company) and, moreover, under Netherlands law, the duties of a director are primarily to the company, not to its shareholders.”
In sum, even if the plaintiffs can demonstrate that the tender offer price is grossly inadequate such proof would not support the requested injunction since under Dutch law such a fact would not constitute a breach of the majority shareholder’s duty.
Even if United States law is applicable, a duty to offer a fair price is not necessarily imposed on a majority shareholder. The nature of the attempted corporate take-over is critical in defining the extent of the majority shareholder’s duty. I begin by examining the case law of Delaware, since that State offers for analysis the most well-developed body of corporation law in this country.
*77 Under Delaware law, the fiduciary duty of a majority stockholder making a tender offer is generally limited to the duty of full disclosure (see, Lynch v Vickers Energy Corp., 383 A2d 278 [Del 1977]). In Lynch the owner of a majority of the outstanding common stock of TransOcean Oil, Inc., made a tender offer to purchase all of TransOcean’s outstanding common stock at $12 per share. As a result of the offer, Vickers obtained some four million additional shares. Thereafter, the plaintiff, a former TransOcean minority shareholder, commenced a class action for money damages contending that Vickers had violated its fiduciary duty toward the minority shareholders. A dismissal of that action was reversed by the Supreme Court of Delaware which explained that "the limited function of the Court was to determine whether defendants had disclosed all information in their possession germane to the transaction * * * [i.e.,] information such as a reasonable shareholder would consider important in deciding whether to sell or retain stock” (see, Lynch v Vickers Energy Corp., 383 A2d 278, 281, supra). The court concluded that although Vickers had accurately disclosed that TransOcean’s net asset value had been estimated at " 'not less than $200,000,000 ...’*** 'and could be substantially greater’ ”, that disclosure was not completely candid as it failed to disclose a second, more optimistic estimate in Vickers’ possession, which estimate fixed the net asset value at $250.8 million (supra, at 280).
It must be remembered that a tender offer is fundamentally a simple invitation by the offeror to buy the stock of a corporation within a specified period of time at a specified price (see, 8 Cavitch, Business Organizations § 166A.01; Note, The Developing Meaning of ”Tender Offer” Under the Securities Exchange Act of 1934, 86 Harv L Rev 1250-1251). Because the stockholder is under no compulsion to turn over possession of his shares in response to a tender offer, the majority shareholder’s duty when making a tender offer is generally limited to full disclosure (see, Joseph v Shell Oil Co., 482 A2d 335, 341 [Del Ch 1984]).
The choice offered to minority shareholders in a tender offer situation should be contrasted with the "freezeout” (or "cash-out”) merger method of takeover, which eliminates the interest of minority shareholders without choice on their part. In a freezeout merger, the target corporation is merged into a wholly owned subsidiary of the acquirer and the minority shareholders in the target corporation are forced to surrender *78 their shares, either for the price of a prior tender offer or for a price determined by a special court appraisal proceeding (6 Cavitch, Business Organizations § 127.10 [1], [6]). "Freezeouts, by definition, are coercive: minority stockholders are bound by minority rule to accept cash or debt in exchange for their common shares, even though the price they receive may be less than the value they assign to those shares” (Brudney and Chirelstein, A Restatement of Corporate Freezeouts, 87 Yale LJ 1354, 1357).
In Weinberger v UOP, Inc. (457 A2d 701) the Supreme Court of Delaware considered a challenge to a cash-out merger. In this context, the court imposed on the directors placed on the board by the majority shareholder a duty of "entire fairness” composed of not only a fiduciary duty of full disclosure, but also a duty to pay a fair and adequate price for the minority shares. (Supra, at 710.)
Similarly, in New York, the forum State, the Court of Appeals has imposed upon a majority shareholder the duty to offer a fair price in a case where minority shareholders challenged an attempted freezeout merger as unfair (see, Alpert v 28 Williams St. Corp., 63 NY2d 557). In Alpert, the Court of Appeals made clear that the majority shareholder’s fiduciary duty with regard to fair price is imposed because "the merger seeks to cancel the minority’s shares in exchange for cash” (see, Alpert v 28 Williams St. Corp., supra, at 571), and further that the fiduciary duty of a majority shareholder is altered depending on the nature of the corporate transaction (Alpert v 28 Williams St. Corp., supra, at 569). Thus, in the context of freezeout merger, New York law imposes on the majority, inter alia, a duty to offer a fair price. It is by no means apparent, however, that in the context of a tender offer by a majority shareholder, any duty to offer a fair price would be imposed by the Court of Appeals upon the offeror. No such case has been cited by the plaintiffs, nor has research disclosed any.
Parenthetically, even if a duty to offer a fair price were imposed by New York law upon a majority shareholder’s tender offer, and even it such law were applicable to Ausimont’s shareholders, I am unable to conclude on the record before me that the $35-per-share offer is unfair, or even to find it reasonably likely that such a finding would ultimately be reached. Reasonable people may differ as to the value of property; indeed, expert appraisers generally do (see, Joseph v Shell Oil Co., 482 A2d 335, 341, supra). Moreover, a court’s *79 determination of whether fair value was offered in these circumstances would of necessity be — at best — a loose approximation of an actual appraisal proceeding; if the purchase price is "reasonably related” to the value that might be set by an appraisal proceeding ordered pursuant to Business Corporation Law § 623, the "fair price” duty is satisfied (see, Alpert v 28 Williams St. Corp., 63 NY2d 557, 571, supra). Upon the submissions, I conclude that the $35 offer is not necessarily violative of any fair price duty.
COERCION
The plaintiffs also allege that the challenged tender offer is so coercive as to be improper, in that the specter of the Dutch transfer proceeding, which Montedison says it will initiate if it obtains 95% of Ausimont’s stock, acts to pressure the minority to sell at the inadequate price offered rather than risk owning unmarketable stock. I reject this contention for several reasons. First, there is a good argument to be made that if Montedison failed to disclose this information the failure might be actionable (see, Missouri Portland Cement Co. v Porter Co., 535 F2d 388, 393 [8th Cir 1976]).
Second, it is clear that the plaintiffs are attempting to characterize this situation, by implication, as analogous to the so-called "two-tier tender offer” or "two-step merger”. The first tier of a two-step merger involves a tender offer at a premium price in order to obtain a controlling interest in the target corporation. The second tier, which takes place once the offeror has gained control of a majority of the shares, is a freezeout merger for the minimum possible fair price — with the right to an appraisal proceeding the minority from an unfair second-tier price (see, Note, Protecting Shareholders Against Partial and Two-Tiered Takeovers: The "Poison Pill” Preferred, 97 Harv L Rev 1964, 1966; Brudney and Chirelstein, A Restatement of Corporate Freezeouts, 87 Yale LJ 1354, 1360). In many respects, Ausimont’s situation is comparable to a two-step merger: although Montedison already holds a majority of the target’s shares, it seeks to obtain a greater percentage of the corporate stock in order to be able to cash-out the remaining minority shareholders. In both types of two-step plans, an attempt to pressure the minority shareholders to tender their shares is an element of the plan. However, although such a two-step plan is by definition coercive (see, Note, Protecting Shareholders, op. cit., 97 Harv L Rev, at *80 1966), the coercive element in a two-step merger plan as a whole is not enough to render the first step, or the plan as a whole, illegal or improper. Rather, the law in this country offers its protection to the shareholders by the means previously discussed: the imposition of fiduciary obligations of fairness and the appraisal remedy (see, Weinberger v UOP, Inc., supra).
Moreover, it must be recalled that the threatened transfer proceeding is by no means a certainty; Montedison may only commence one if it first obtains an additional 20% of Ausimont’s shares. The speculative nature of the threat lessens the element of coercion.
In sum, the contention that the challenged tender offer is coercive has some basis in fact; but it is not the degree of coercion which would warrant enjoining the offer.
FAILURE TO DISCLOSE MATERIAL INFORMATION
As mentioned previously, the defendants concede that a legal duty of reasonableness and fairness must be imposed upon Montedison (Dutch Civ Code arts 7, 8). While this court is not apprised of any Dutch case law to assist in applying that duty in this instance, I note that even the defendants cite and rely on United States case law to explain and apply the duty of reasonableness and fairness. For instance, the defendants agree that encompassed in this duty is the obligation to disclose in the tender offer any material information. By definition, material information is anything substantially likely to be considered important by a reasonable shareholder in deciding what action to take (see, State of New York v Rachmani Corp., 71 NY2d 718, 726). The omission of such material information renders the selling minority shareholder unable to make an informed decision, resulting in a fundamentally unfair sale (see, Mader v Armel, 402 F2d 158 [6th Cir 1969], cert denied sub nom. Young v Mader, 394 US 930).
The sort of omission which meets the materiality standard is presented in Joseph v Shell Oil Co. (482 A2d 335, supra). There, the appraiser hired by the majority shareholder to estimate the value of the company’s shares, although informed of the existence of certain "probable oil reserves” owned by the company, was not furnished with any of the available detailed information relating to the value of those probable reserves. Nor did the offering circular disclose this omission, but rather it merely related that the appraiser’s *81 estimate was based solely on publicly disclosed information. The court held that the majority shareholder’s failure to disclose available data relating to the value of the probable reserves, and its further failure to disclose that this essential and necessary information had been withheld from the appraiser, violated the duty of complete and candid disclosure (Joseph v Shell Oil Co., 482 A2d 335, 341, supra). This and other troublesome failures of disclosure led the court to preliminarily enjoin a tender offer (supra, at 345).
The alleged failures of disclosure raised here by the plaintiffs do not rise to the level of materiality demonstrated in Joseph v Shell Oil (supra). Montedison properly disclosed the substantial range of values estimated by its appraiser Morgan Stanley and disclosed that the special committee had rejected the $35 per share offer as inadequate. These pieces of information represent the heart of the information needed by the minority shareholders to arrive at an informed decision; its disclosure sufficed to satisfy Montedison’s obligation. The specific problems ascribed to the circular by plaintiffs are either inconsequential or inappropriate to demand from a tender offer circular. For instance, the offeror need not include in the circular the reasons why the special committee rejected the offer — indeed, it does not appear that Montedison had any way of knowing the committee’s reasons. Similarly, an asserted belief on the part of certain special committee members that Montedison might be willing to pay $36.25, or that during negotiation Montedison indicated it might pay that amount, does not shed additional light on the value of the shares and was irrelevant to the circular’s purpose.
The plaintiffs also complain that the circular fails to explain how Morgan Stanley arrived at its valuation of each Ausimont asset and further fails to elaborate sufficiently on the value to Montedison of Dutral’s elastomer division. This information would require the offeror to include in the circular the complete financial analysis of the appraiser — a requirement which appears to far exceed the extent of disclosure required by any court or statute.
The plaintiffs have therefore failed to demonstrate any likelihood that they can establish a breach of duty on the part of Montedison.
IRREPARABLE HARM AND BALANCING OF EQUITIES
Further, I fail to perceive the irreparable nature of the *82 injury alleged. If the offering price is found to be inadequate or unfair, money damages are available to compensate the plaintiffs. This is particularly true since here the plaintiffs never controlled the corporation; the value to them of their shares was purely monetary value (see, Tanzer Economic Assocs. v Universal Food Specialities, 87 Misc 2d 167 [Sup Ct, NY County, Greenfield, J.]).
Finally, a balancing of the equities must take into account that while an injunction would strengthen the plaintiffs’ position and prevent any possible failures of disclosure, it would have a substantially damaging effect on the defendant. Besides simply delaying the offer, an injunction might well be interpreted by shareholders as a finding of wrongdoing on defendants’ part, which could in turn substantially diminish the possibility of the offer’s success, even if it is ultimately upheld in all respects (cf., Jewelcor Inc. v Pearlman, 397 F Supp 221, 252 [SD NY 1975]).
In conclusion, the plaintiffs have failed to sustain their burden and a preliminary injunction is unwarranted. The motion is therefore denied.