# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE APPRAISAL OF | ) | Consolidated |
| ANCESTRY.COM, INC. | ) | Civil Action No. 8173-VCG |

## <u>MEMORANDUM OPINION</u>

Date Submitted: October 14, 2014
Date Decided: January 30, 2015

Kevin G. Abrams, J. Peter Shindel, Jr., and Matthew L. Miller, of ABRAMS & BAYLISS LLP, Wilmington, Delaware, *Attorneys for Petitioner Merion Capital, L.P.*

Ronald A. Brown, Jr., Marcus E. Montejo, and Eric J. Juray, of PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware, *Attorneys for Petitioners Merlin Partners LP and The Ancora Merger Arbitrage Fund, LP*.

Stephen C. Norman, Kevin R. Shannon, and James G. Stanco, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Stephen R. DiPrima, William Savitt, Adam M. Gogolak, and Steven Winter, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for Respondent Ancestry.com, Inc.*

GLASSCOCK, Vice Chancellor

I am tasked with determining the "fair value" of shares of a publicly-traded company, in this case shares formerly held by the Petitioners, who were cashed out in the purchase of Ancestry, Inc. ("Ancestry" or the "Company") by a private equity investor, Permira Advisors, LLC ("Permira"). The sale was at a 40% premium to the market price untainted by the auction process, which process itself involved a market canvas and uncovered a motivated buyer. The price paid stockholders who tendered in the sale was $32. The Petitioners' valuation expert proved something of a moving target; he argued that the fair value of a share of Ancestry stock at the time of the merger was as high as $47, but at least $42.81. The Respondent's expert opined that fair value was $30.63, despite the fact that the buyer, a non-strategic investor with actual money at risk, was willing to pay more.

I have commented elsewhere on the difficulties, if not outright incongruities, of a law-trained judge determining fair value of a company in light of an auction sale, aided by experts offering wildly different opinions on value. I will not repeat those comments here.[1] It is worth noting, however, that this task is made particularly difficult for the bench judge, not simply because his training may not provide a background well-suited to the process, but also because of the way the statute is constructed. A judge in Chancery is the finder of fact, and is frequently

---

[1] *See Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *1 (Del. Ch. Nov. 1, 2013), *adhered to*, 2014 WL 2042797 (Del. Ch. May 19, 2014), *judgment entered sub nom., Huff Fund Inv. P'ship v. CKX, Inc.* (Del. Ch. June 17, 2014).

charged to make difficult factual determinations that may be without his area of expertise. The saving judicial crutch in such situations is the burden of proof. The party with the burden must explain why its version of the facts is the more plausible in a way comprehensible and convincing to the trier of fact; if not, it has failed to carry its burden, and the judge's duty is accordingly clear. A judge in a bench trial relies, therefore, on the burden of proof; he holds on to it like a shipwreck victim grasps a floating deck-chair or an ex-smoker hoards his last piece of nicotine gum. Section 262 is unusual in that it purports explicitly to allocate the burden of proof to the petitioner *and* the respondent, an allocation not meaningful in light of the fact that no default exists if the burden is not met; in reality, the "burden" falls on the judge to determine fair value, using "all relevant factors."[2] Here, therefore, I must independently review those factors to determine "fair value," the price per share to which the Petitioners are entitled. The results of my analysis are set out below.

## I. BACKGROUND FACTS

*A. The Business of Ancestry*

Ancestry is described as "a pioneer and the leader in the online family research market," having "digitized, indexed, and added" to its websites "more

---

[2] 8 *Del. C.* § 262(h).

than 12 billion historical records . . . over the past 18 years."[3] It "is the world's largest online family history resource,"[4] and has over two million subscribers.[5] The Company also recently launched AncestryDNA, selling $99 DNA test kits, though the subscription services are still its most significant source of revenue.[6]

In November 2009, Ancestry became a publicly-traded company, trading at $13.50 per share.[7] Several months later, in March 2010, the show *Who Do You Think You Are?*, for which Ancestry was the financial and research sponsor, began airing on Friday nights on NBC.[8] This show featured celebrities learning more about their own family histories; Ancestry provided all of the research for these episodes.[9] Additionally, "Ancestry purchased product integration and advertising on the show, which generated substantial new interest in its services."[10]

This show, which aired on NBC for three seasons, was a "massive catalyst for growth."[11] Between 2009 and 2011 in particular, Ancestry experienced an unprecedented acceleration of new subscribers—the "North Star metric" for this

---

[3] JX 279 at 4.
[4] Trial Tr. 7:19–20 (Sullivan).
[5] JX 279 at 4.
[6] Trial Tr. 8:15–18 (Sullivan).
[7] JX 260 at F–16.
[8] *See, e.g.*, Trial Tr. 113:5–6 (Hochhauser).
[9] *See, e.g.*, *id.* at 111:24–112:8 (Hochhauser).
[10] Resp't's Opening Post-Tr. Br. at 21–22.
[11] Trial Tr. 112:10, 113:12 (Hochhauser); *but see id.* at 112:21–113:2 (Hochhauser) (noting that Ancestry did not do any studies relating to the show and its specific effects on the business).

subscription business—leading to strong growth in revenue and EBIDTA.[12]  By early 2011, Ancestry stock was trading at over $40 per share.[13]  The show was ultimately cancelled in May 2012, the same day that it was nominated for an Emmy award.[14]

### 1. Key Metrics

As an internet-based, subscription-driven company, Ancestry's key business metrics include gross subscriber additions ("GSAs"), churn, and subscriber acquisition cost ("SAC").  GSAs "measure the total number of new customers who purchase a subscription during any given period."[15]  Churn measures the number of cancelled subscriptions in a given period, represented as a percentage of the total subscriber base.[16]  Finally, SAC measures the "efficiency of [Ancestry's] marketing and advertising programs in acquiring new subscribers" by calculating the average cost of each new subscriber.[17]

Howard Hochhauser, Ancestry's CFO and COO, testified at trial that SAC is an important driver of EBITDA because marketing costs are Ancestry's largest variable costs.[18]  Churn is a proxy for the "health of [the] existing business."[19]

---

[12] *See, e.g.*, *id.* at 111:18–112:20 (Hochhauser).
[13] *See, e.g.*, JX 211 ¶ 34; JX 260 at 36 (noting that Ancestry repurchased some of Sullivan's shares for an average price of $41.67 per share).
[14] *See* Trial Tr. 113:10–13 (Hochhauser).
[15] Resp't's Opening Post-Tr. Br. at 26; *see also* Trial Tr. 109:6–10 (Hochhauser).
[16] *See* Resp't's Opening Post-Tr. Br. at 27; JX 260 at 36; Trial Tr. 110:5–14 (Hochhauser).
[17] JX 260 at 36; *see also* Resp't's Opening Post-Tr. Br. at 28; Trial Tr. 110:17–21 (Hochhauser).
[18] *See* Trial Tr. 110:22–111:8 (Hochhauser).

Churn, together with GSAs, gives a picture of the subscriber base in a given period; as a subscription business, these two metrics make up the all-important "hamster wheel of new people coming in and people existing at the same time."[20]

## 2. Competitive Forces

Ancestry faces several competitive forces, including a number of start-up companies[21] and an increasing amount of free archived information more readily accessible by internet search engines.[22] Additionally, the Church of Jesus Christ of Latter Day Saints operates a website that has resulted in a "competitive dynamic" for Ancestry.[23] The website, FamilySearch.org, provides free online access to some of the Church's extensive resources—the Church has aggregated "what's recognized as the world's largest collection of data and content that would be valuable for people researching their family history."[24] This collection previously enticed interested individuals to travel to Salt Lake City, but the FamilySearch.org website has begun digitizing the collection and "includes a lot of the same features and functionality" as Ancestry.com.[25]

---

[19] *Id.* at 108:22–23 (Hochhauser).
[20] *Id.* at 109:13–14 (Hochhauser).
[21] *See, e.g.*, *id.* at 8:24–9:5 (Sullivan); *id.* 118:5–11 (Hochhauser).
[22] *See, e.g.*, *id.* at 10:12–11:4 (Sullivan); *id.* 107:21–108:1 (Hochhauser).
[23] *Id.* 10:4–11 (Sullivan). *But see id.* 53:12–54:5 (Sullivan) (noting that Ancestry has actually worked with the Church in some capacities, including digitizing certain of the Church's records).
[24] *See id.* at 9:15–23 (Sullivan).
[25] *Id.* at 9:20–10:3 (Sullivan).

*B. The Sales Process*

By early 2012, Ancestry stock was trading in the low-$20s. Around that time, "[i]nterest rates were at a record low," and the Company was approached by a few private equity firms.[26] After receiving these unsolicited overtures, Ancestry's board began exploring strategic options for the Company. Ancestry's nine-member board included six independent directors, the Company's CEO, Timothy Sullivan, and two directors who were principals at Spectrum Equity ("Spectrum"), which at that time owned approximately 30% of the Company.[27]

At an April 19, 2012 board meeting, Qatalyst Partners ("Qatalyst"), a financial advisor, made a presentation to Ancestry's directors.[28] In this "state of the union"[29] presentation, Qatalyst raised as among its concerns that Ancestry "was getting people that were less engaged in the hobby" and who would not maintain their subscriptions, though the Company's subscription base had been growing as a result of *Who Do You Think You Are?*.[30] Qatalyst noted that Ancestry's subscription-based service raised questions regarding "the size of Ancestry's

---

[26] *Id.* at 113:23–114:4 (Hochhauser); *see also id.* at 12:18–24 (Sullivan) ("This was a time where interest rates were historically low, and so the kind of company that Ancestry was, which is a subscription business, sort of more predictable than other kinds of businesses, really made, you know, Ancestry a potentially very attractive business for a private equity group to acquire . . . .").

[27] *Id.* at 12:2–7 (Sullivan).

[28] *See* JX 22; JX 23. The board retained Qatalyst in May. *See* JX 33; JX 35.

[29] Trial Tr. 114:24 (Hochhauser).

[30] *Id.* at 116:23–117:3; *see also* JX 22; JX 23.

available market, [and] the degree to which Ancestry had already saturated that market."[31]  As Jonathan Turner, a Qatalyst Partner, testified at deposition:

> There are only so many people who are interested and have the time to be able to devote a significant amount of their free time to genealogy and using the company's product and be willing to pay for it.  And that was a—that was a concern because once the company hit . . . single-digit millions of subscribers, at this point the business was largely U.S. with a little bit of—a little bit of U.K.  How many people left are there?[32]

The future of *Who Do You Think You Are?* was also uncertain, largely due to declining ratings;[33] as noted, the show was cancelled the month following this meeting, just as the auction process began.

### 1. The Auction Process

Given the board's go-ahead, the auction process commenced in May 2012. Qatalyst reached out to a group of potential strategic buyers and financial sponsors including preeminent private equity firms and strategic partners that "the company had had some contact with at various times in the past or that Qatalyst thought might be particularly interested in the business."[34]  In early June, news of the auction process was leaked, and on June 6, Bloomberg published an article detailing the previously confidential process.[35]  After the news of a potential sale of

---

[31] Resp't's Opening Post-Tr. Br. at 22 (citing JX23 ACOM00000064–65; Turner Dep. (2014) 27:10–30:1); *see also* Trial Tr. 115:23–116:2 (Hochhauser).

[32] Turner Dep. (2014) 27:16–24.

[33] Trial Tr. 117:7–15 (Hochhauser); *see also* JX 22; JX 23.

[34] Trial Tr. 15:23–16:8 (Sullivan).

[35] *See, e.g.*, *id.* at 16:10–17:4; JX 79 at ACOM00000376.

7

Ancestry became public, additional parties contacted the Company to express interest; Qatalyst ultimately held discussions with fourteen potential bidders, six potential strategic buyers and eight financial sponsors.[36]

By June, nine potential bidders had signed non-disclosure agreements, thereafter receiving confidential information about the Company and meeting with management, including Ancestry's CEO and CFO.[37] Ultimately, seven potential bidders submitted non-binding preliminary indications of interest, with bids falling in a range from $30-$31 to $35-$38.[38]

Following these preliminary expressions, the Company invited the three highest bidders, including Permira, to engage in full diligence.[39] According to Ancestry's CEO Timothy Sullivan, during this extensive diligence process, these bidders "developed to varying degrees some real negativity about the company's prospects," which "significantly changed all of their views about value and . . . go-forward strategies."[40] Some of these bidders worked with their consultants to develop, based on data provided in diligence, detailed analyses of important

---

[36] JX 79 at ACOM00000376.

[37] *See id.*; Trial Tr. 17:5–18:20 (Sullivan).

[38] *See* JX 100 at ACOM00000395–97; Trial Tr. 18:21–20:4 (Sullivan) (describing an earlier stage in the process, by which time five bidders submitted preliminary indications of interest).

[39] *See, e.g.*, Trial Tr. Sullivan 20:15–21:20 (explaining that the Company decided to focus on the three highest bidders, after being advised by Qatalyst, for both logistical reasons and "to create a competitive dynamic").

[40] *Id.* at 23:17–22 (Sullivan); *see also id.* at 24:18–21 (Sullivan) ("[T]here was some sense that . . . Ancestry was a niche and it would have difficulty growing beyond this segment of serious genealogists.").

metrics such as "renewal data and the engagement among different segments."[41] These cohort analyses "broke down the different cohorts of people that joined a year ago or six months ago or three months ago, and sought to track the retention rates of similar groups of cohorts at different times."[42] The Company had not previously conducted similar studies.[43] The conclusions drawn from these studies were not favorable, showing declining trends across every cohort of monthly subscribers, at a time when these subscribers accounted for 60% of Ancestry's business.[44] Hochhauser characterized this data as "the two-by-four over the head[;] 'Hey, guys, not sure you're aware of this, but this is pretty important.'"[45]

Qatalyst had set a deadline of early August for submission of final bids. When no party submitted a bid by that deadline,[46] and despite the existence of a don't-ask-don't-waive provision, a fourth bidder, Hellman & Friedman ("H&F"), was re-invited into the process.[47] Although initially enthusiastic to engage in the

---

[41] *Id.* at 24:22–24 (Sullivan); *see also id.* at 25:2–7 (Sullivan) ("[G]enerally, there was some quite negative conclusions reached from some of that research with respect to, you know, degrading retention rates amongst certain cohorts and, you know, frankly, less engagement with the site among some segments of subscribers than they would have expected.").

[42] *Id.* at 25:15–20 (Sullivan); *see also id.* at 139:12–140:6 (Hochhauser); JX 82.

[43] *See, e.g.*, Trial Tr. at 25:20–22 (Sullivan) ("[T]hat was actually a level and depth of retention analysis that the company had not done prior to that point."); *id.* at 140:8–14 (Hochhauser) (same, but noting also that this is now a standard analysis for the Company).

[44] *See id.* at 142:6–8 (Hochhauser).

[45] *Id.* at 142:2–4 (Hochhauser). Importantly, projections prepared in May for the sales process, which forecasted a decline in churn, were called into question by these new studies. *See id.* at 143:8–20 (Hochhauser) (using more colorful language than I have here).

[46] *Id.* at 25:23–26:8 (Sullivan).

[47] *See, e.g., id.* at 28:9–18 (Sullivan); JX 112.

due diligence process, H&F became concerned after familiarizing itself with Ancestry's data and did not submit a bid.[48]

At this point, the Company hired Goldman Sachs to "make some recommendations for what the company could do as an ongoing stand-alone public company."[49] As Sullivan noted at trial, "[I]t was really the sort of Plan B option, as we referred to it internally."[50]

Meanwhile, the Company pursued the sales process. With two parties maintaining their interest in the Company, a partnership between these bidders was explored, but ultimately unsuccessful.[51] On October 3, 2012, Permira submitted a bid of $31.[52] Permira raised its bid to $31.25, and ultimately to $32, after further negotiation.[53] During these final price negotiations, Turner sent an email to Sullivan expressing, "I told [Brian Ruder of Permira] that $32 was our line in the sand and we would not take anything less than that to the board."[54] Sullivan responded, in part:

---

[48] *See, e.g.*, Trial Tr. at 31:3–16 (Sullivan) ("[T]hey found a lot of people who were subscribing to the product but that weren't even visiting and weren't engaging. And that really, really troubled them. . . . [T]here were some things about, again, the size of the addressable market, some of the competitive dynamics.").

[49] *Id.* at 32:5–7 (Sullivan).

[50] *Id.* at 32:12–13 (Sullivan).

[51] *Id.* at 32:23–33:20 (Sullivan) (explaining that one of these parties, upon engaging in further diligence, "ended that process probably even a little more negative than the first time that they walked away").

[52] JX 156.

[53] Trial Tr. 34:14–19 (Sullivan).

[54] *See* JX 162.

I would strongly urge that we communicate even more clearly to Brian tomorrow morning the following:

1.      If we hit Monday morning with him at $31.99 or lower, we are done. There will be no additional counter offer. We are done and moving on [] with [the] press release[,] Q3 numbers[,] stock buy-back plans, etc[.] At least this is my personal view and one that I will share actively with the [board]. I will shave, put on a nice shirt, and throw myself energetically back into the job of being a public company CEO[,] with the extra vendetta of making the entire private equity industry look like idiots over the next couple of years.

2.      If we hit Monday morning with him at $32.25, I will be an active advocate for this deal. I feel strongly that this is a price that is fair to shareholders.

3.      If we hit Monday morning and we are between $32 and $32.24, I will largely defer to the independent members of the [board]. I might support the deal at this level, but I will not lead the charge to have it approved. This is a modest toughening of my previous position, but I am flabbergasted by his incrementalism, and I do not want this to drift into next week. . . .[55]

At trial, he explained that this language was meant to provide Turner with "some words, a real stick . . . that he could use to advance his negotiations with Mr. Ruder."[56] Sullivan further clarified that "this was a calculated . . . effort" as the Company had "determined that there was a reasonable chance [it] could get Permira to up their bid to [$]32," so he was using this as "a tactic to . . . draw a line in the sand and . . . lead Permira to believe that below [$]32, it wasn't going to

---

[55] *Id.*
[56] Trial Tr. 36:11–15 (Sullivan).

happen."[57] It was, in short, intended as "a little bit of dramatic flourish."[58] As noted, after active negotiation, Permira eventually offered $32.

On October 18, the board reviewed Permira's proposal, as well as a Qatalyst presentation on its fairness opinion.[59] At this meeting, the board approved the merger with Permira. The $32 price represented a 41% premium on the unaffected trading price of Company stock.[60] On October 21, Ancestry entered into a merger agreement with Permira affiliates Global Generations International, Inc. ("Global") and its wholly owned subsidiary, Global Generations Merger Sub Inc. ("Merger Sub").[61]

The merger was announced on October 22. During the two-month period between the announcement of the merger and the closing, no topping bid emerged, despite a fiduciary out clause in the merger agreement.[62] On December 27, 2012, a majority of Company stockholders approved the merger; in fact, 99% of voting shares voted in favor of this transaction.[63] On December 28 (the "Merger Date"), Ancestry merged with Merger Sub, with Ancestry as the surviving corporation. Ancestry is now a wholly owned subsidiary of Global.

---

[57] *Id.* at 36:16–24 (Sullivan).

[58] *Id.* at 37:23–24 (Sullivan); *see also id.* at 37:1–38:24 (Sullivan) (describing Sullivan's strategy and explaining another part of the email that is not quoted here).

[59] *See* JX 182; JX 183.

[60] Resp't's Opening Post-Tr. Br. at 1, 6.

[61] *See* JX 187 at 1, 60; JX 268.

[62] *See* JX 197 at 77–78; *id.* Annex A at 35–36 (Merger Agreement § 5.3(d)).

[63] JX 274.

## 2. Management Projections

Ancestry did not prepare management projections in the ordinary course of business; the projections prepared in connection with the sales process were "the first time that [Ancestry had] ever done long-term projections."[64] In fact, "[u]p until that point [May 2012,] [Ancestry] had frankly never done anything out past [] one year."[65]

Hochhauser worked with Curtis Tripoli, head of Ancestry's financial planning and analysis ("FP&A") group, and his team, as well as Sullivan, in preparing the Company's projections.[66] The goal was to "come up with a set of optimistic projections that we could stand in front of a room and walk through and present, but that we know are going to be very optimistic."[67] The motivation to be optimistic derived in part from the belief that potential bidders were "going to cut back or discount what we say, so we want to give ourselves some room or some cushion."[68]

---

[64] Trial Tr. 119:13–14 (Hochhauser).

[65] *Id.* at 119:18–19 (Hochhauser); *see also id.* at 47:17–19 (Sullivan).

[66] *See, e.g.*, *id.* at 122:8–9 (Hochhauser) (noting that Sullivan would provide feedback); *id.* at 47:1–8 (Sullivan) ("I was, you know, involved at a high level [with preparing these projections] . . . I'm on the front end of the process, sort of agreeing to the philosophy of how we want to approach that, occasionally involved in setting some of the assumptions, but always involved in, you know, formally approving or giving my stamp of approval to the work of the finance group.").

[67] *Id.* at 122:18–23 (Hochhauser).

[68] *Id.* at 123:4–6 (Hochhauser).

### a. The May Projections

In early May, a set of projections was developed that addressed the key metrics of Ancestry's business—GSAs, churn, and SAC (the "Initial May Projections"). According to Sullivan "the view was that these were forecasts that were going to be used by people that were going to . . . potentially bid to buy the company. And so we determined that we wanted those to certainly be optimistic, even aggressive."[69]

Hochhauser presented these projections to the Company's directors at a May 15 board meeting.[70] Hochhauser noted in a May 14 email to the board enclosing materials for the meeting that he had adjusted the projections to account for NBC's recent cancellation of *Who Do You Think You Are?*.[71] After reviewing these projections, "the board's push-back was that you guys really need to turn—you know, be a touch more aggressive here and accelerate your growth."[72]

Hochhauser took the board's "feedback [to] try to make [the projections] more aggressive" and in fact "made them slightly more aggressive."[73] In these new projections (the "May Sales Projections," and collectively with the Initial May Projections, the "May Projections"), management "turned the dials—GSA, SAC,

---

[69] *Id.* at 47:23–48:4 (Sullivan).
[70] JX 29 at ACOM00043393-400.
[71] *See id.* at ACOM00043393; JX 28.
[72] Trial Tr. 132:13–16 (Hochhauser).
[73] *Id.* at 133:2–6 (Hochhauser); *see also id.* at 190:24–191:2 (Hochhauser) ("The board's feedback was to make them—you know, just to turn them a little more, to modestly increase the growth rates and revenue and EBITDA.").

14

churn—as much as [they] could while maintaining . . . credibility."[74] Specifically, "to go much beyond what [management] did, you would have to assume some new business, creation of new business."[75] These updated projections were presented to and approved by the board, and provided to interested parties during the sales process.

### b. The October Projections

After receiving the May Sales Projections, some bidders commented that the assumptions were optimistic and aggressive.[76] That fall, partly in response to bidder feedback, management developed a new set of projections (the "October Projections"). Qatalyst had also been "pretty clear . . . that they likely couldn't render a fairness opinion based upon those May numbers."[77] As Hochhauser put it, "[i]f we're selling the company, the board would need to have the best set of numbers they could possibly have to make an important decision."[78]

To develop the October Projections, Hochhauser, working with Curtis, and others in Ancestry's FP&A group, along with Sullivan, underwent the "[s]ame

---

[74] *Id.* at 133:21–24 (Hochhauser); *see also* Tripoli Dep. 35:1 (describing the May Sale Projections as "aggressive yet believable"); JX 43 at ACOM00174689; JX 37 at ACOM0000681115.

[75] Trial Tr. 133:24–134:2 (Hochhauser).

[76] *See, e.g.*, *id.* 144:13–18 (Hochhauser); Turner Dep. (2014) 135:20–24; *see also* JX 174 at ACOM00174922 (presenting this feedback to the board). As noted above, some bidders had conducted their own cohort studies that undermined certain assumptions in the May Sales Projections. *See supra* notes 41–45; Trial Tr. 148:5–11 (Hochhauser).

[77] Trial Tr. 145:20–22 (Hochhauser); JX 273.

[78] Trial Tr. 145:11–14 (Hochhauser).

process mechanically" as they had for the May Projections.[79] In August, however, the budget process had begun,[80] and the Company "had actualized or closed the months leading up through September."[81] Accordingly, "2012 was sort of a tighter set of numbers."[82]

The updated numbers, in addition to the incorporation of bidder feedback, led to projections that were more conservative than the May Sales Projections previously approved by the board and provided to bidders.[83] As Hochhauser noted, in this set of projections, management—"shooting for the bull's eye of numbers"— was "not trying to be optimistic or pessimistic. We're trying to be right down the middle."[84] Sullivan relayed that the "philosophy" behind these projections was "accuracy."[85]

On October 11, the October Projections were finalized. These Projections included two scenarios—Scenario A and Scenario B (the "Scenarios")—which were not weighted; instead, they were meant to act as outer "goalposts" of a range, with the goal being "to just look between the two of them."[86] At trial, management

---

[79] *Id.* at 146:1–5 (Hochhauser).
[80] *Id.* at 146:21–147:2 (Hochhauser).
[81] *Id.* at 146:5–8 (Hochhauser).
[82] *Id.* at 146:8–9 (Hochhauser).
[83] *See, e.g.,* JX 170 (comparing the May Sales Projections to the October Projections' Scenario A and Scenario B).
[84] Trial Tr. 146:10–13 (Hochhauser).
[85] *Id.* at 49:13–15 (Sullivan).
[86] *Id.* at 151:10–13 (Hochhauser).

opined that these were the best estimates of the Company's future performance.[87] Notably, however, at the time the Scenarios were being created, management was also contemplating equity rollovers into the new company.

### 3. Equity Rollover

Because Ancestry was engaging with a private equity bidder, Sullivan understood that there could be an expectation that he would rollover around 50% of his equity into the new company.[88] In anticipation of this rollover, Sullivan conducted several calculations, which he also sent to Hochhauser and Turner in an email that ended: "ANCESTRY.COM IS GOING TO BE HUGE!!!!!"[89] At trial, Sullivan described this exclamation as "a bit of an ironic flourish," noting that:

> After months of really being beat down from prices that we thought we would be able to get at the beginning of the process to a low price, I was offering to use the fact that I was now prepared to roll over a big chunk of my equity to actually, you know, use that as an argument or a point of leverage to take to these buyers and show that, you know, look, the CEO is serious. The CEO thinks it's going to be huge. So I guess its tongue-in-cheek or ironic or something.[90]

Additionally, Sullivan ran his own calculations involving Company stock and its potential reaction to a transaction with a private equity buyer; he shared these calculations with Hochhauser in emails entitled "incredible hack" and "hack

---

[87] *Id.* at 49:20–23 (Sullivan); *id.* at 157:22–158:2 (Hochhauser).
[88] *Id.* at 39:5–13 (Sullivan).
[89] JX 134 at ACOM00008290.
[90] Trial Tr. 40:21–41:7 (Sullivan).

version 2."[91] At trial, Sullivan explained that he "meant to convey something simple. It's a doodle. It's not . . . a formal analysis or projection of any kind. Just sort of a . . . really, really simple little hack of a model."[92]

A third iteration of Sullivan's analyses contained two columns, one for "Take Private" and one for "Stay Public."[93] Though this third model has EBIDTA for 2016 under the "Take Private" column, Sullivan disavowed that this was a projection of EBIDTA for 2016, reiterating:

> [I]t's not a formal projection or, you know, forecast of any kind. It's just a simple exercise. I did this on my own, just to try to get a sense of, as I said earlier, the difference between how the P&L would work as a leveraged company versus as a, you know, continued stay-public company where, rather than pay debt service, we would continue to buy back shares. What I was really trying to do is understand the mechanics of staying public versus the mechanics of staying private, not in any way, you know, doing a genuine forecast.[94]

Notably, in light of Sullivan's attempt to minimize the importance of them, the "hacks" were much more optimistic than the October Projections.[95]

Throughout negotiations, as Permira raised its offer, it required increased equity rollover from management and Spectrum, Ancestry's then-largest stockholder. Ultimately, at $32 per share, management agreed to rollover a total of

---

[91] *Id.* at 41:9–13, 41:19–42:2 (Sullivan); *see also* JX 126; JX 283.
[92] Trial Tr. 42:5–10.
[93] JX 239.
[94] Trial Tr. 43:6–23 (Sullivan).
[95] *See, e.g.*, *id.* at 369:14–21 (Wisialowski) ("[Sullivan's projections] were much more closely aligned with the original May projections, and they were drastically different from the Scenario A, in particular, and Scenario B as well, that were used for the basis of the opinion and what became Scenarios A and B.").

18

$82 million in equity,[96] which included 80% of Sullivan's stock;[97] Spectrum rolled over $100 million, which represented approximately 25% of its Ancestry stock.[98]

### C. The Appraisal Remedy

Ancestry received written demands for appraisal dated December 6, 2012 from Cede & Co., nominee for The Depository Trust Company ("DTC") and record holder of the 160,000 shares over which Petitioners Merlin Partners LP ("Merlin") and The Ancora Merger Arbitrage Fund, LP ("Ancora" and, together with Merlin, the "Merlin Petitioners") assert beneficial ownership. Ancestry received a written appraisal demand dated December 18, 2012 from Cede & Co. as record owner of the 1,255,000 shares for which Merion Capital, L.P. ("Merion") asserts beneficial ownership.[99]

### D. Experts' Valuations

The experts of both the Petitioners and Respondent relied exclusively on a discounted cash flow ("DCF") analysis to value Ancestry as of the Merger Date, as opposed to comparable companies and comparable transactions analyses, recognizing that the latter would be irrelevant or unhelpful here, given Ancestry's

---

[96] JX 197 at 2.
[97] Trial Tr. 96:15–17 (Sullivan).
[98] JX 197 at 2; *see also* Resp't's Pre-Trial Br. at 23.
[99] In a Memorandum Opinion dated January 5, 2015, I denied Ancestry's Motion for Summary Judgment as to Merion's Petition. *See In re Appraisal of Ancestry.com, Inc.*, 2015 WL 66825 (Del. Ch. Jan. 5, 2015).

19

unique business and the concomitant difficulty of finding comparable companies or transactions.[100]

The Petitioners' expert, William S. Wisialowski, initially opined that Ancestry was valued at $42.97; after making certain corrections to his analysis, he adjusted this valuation to $43.65,[101] then to $43.05.[102] At his deposition, however, Wisialowski testified that, "[b]ased on the information that was given to [him]," he would not provide a fairness opinion at a price below $47 per share.[103] Finally, at trial, Wisialowski opined that the value of Ancestry was "at least" $42.81 per share;[104] $42.81 is more than 30% higher than the merger price, resulting in a discrepancy of approximately $500 million between the two values.[105]

---

[100] *See* Trial Tr. 254:4–10 (Wisialowski); *id.* at 368:10–16 (Wisialowski); *id.* at 551:20–552:3 (Jarrell); JX 212 ¶¶ 146–47; JX 209 ¶¶ 216–17, 223–225. Jarrell also noted that the merger price "provides a strong indication of fair value." JX 209 ¶ 105. The Petitioners object to the portions of his report opining on the sales process, which formed the basis for his opinion regarding the role of the merger price in the valuation. Ultimately, Jarrell stood upon his value of $30.61, derived from a DCF analysis, though still emphasizing that the $32 merger price was within his calculated range. *See* Trial Tr. 551:8–19 (Jarrell).

[101] *Id.* at 381:8–22 (Wisialowski).

[102] *Id.* at 383:23–384:2 (Wisialowski).

[103] Wisialowski Dep. 75:20–23; *see also id.* at 74:11–22 ("My view is that the company would have been better off for its shareholders maintaining its public status. So I—you know, whether it was—whether it was [$]47, or—part of it is, is the intrinsic value, the DCF value, the cash flow value, it may not have been realizable at this point in time as a sell side transaction. And therefore, I would have shown [Ancestry] what their business was worth, and I would have counseled them that if they want to maximize and optimize value for their shareholders, selling the company now is not the way to do it.").

[104] Trial Tr. 391:2 (Wisialowski); *id.* at 391:22–23 ("I'm comfortable that my value is at least [$]42.81."). *Compare id.* at 392:4–5 ("I believe [an increase] would be justifiable, but I'm comfortable saying it's worth at least [$]42.81."), *with* Wisialowski Dep. 270:18–20 ("My understanding of fairness is that what we're trying to do is we're trying to find the bull's-eye and we only get one shot.")

[105] Resp't's Answering Post-Trial Br. at 2–3.

The Respondent's expert, Gregg A. Jarrell, arrived at a value of $30.63 per share.[106] In arriving at $30.63, Jarrell testified that "the $32 is within that range from a discounted cash flow analysis. And that provides a great deal of comfort to me that the discounted cash flow analysis has validity, is economically meaningful."[107] Wisialowski's analysis, by comparison, resulted in a "big discrepancy" between the value of the Company and the merger price.[108] As Jarrell testified:

> [I]f that were me that was faced up with that big discrepancy, I would have to try to find out a way to reconcile those two numbers, or why would these smart, professional, profit-oriented professional private equity investors leave that much money on the table? Why wouldn't someone pay $33 for this company if, in fact, it were validly worth [$]42 to [$]47 as a stand-alone company? You know, that's a huge valuation gap and that's a lot of implied profit that's been left on the table. And that, to my mind, would create a lot of discomfort regarding my DCF valuation.[109]

### 1. Valuation Background

By way of brief background, and to provide context before recounting the experts' respective calculations and assumptions,

> [t]he basic premise underlying the DCF methodology is that the value of a company is equal to the value of its projected future cash flows, discounted at the opportunity cost of capital. Put simply, the DCF

---

[106] *See, e.g.,* Trial Tr. 551:8–10 (Jarrell).
[107] *Id.* at 559:12–17 (Jarrell).
[108] *Id.* at 559:17–23 (Jarrell).
[109] *Id.* at 559:24–560:11 (Jarrell).

21

method involves three basic components: (i) cash flow projections; (ii) a terminal value; and (iii) a discount rate.[110]

The method "involves several discrete steps"[111]:

> First, one estimates the values of future cash flows for a discrete period, based, where possible, on contemporaneous management projections. Then, the value of the entity attributable to cash flows expected after the end of the discrete period must be estimated to produce a so-called terminal value, preferably using a perpetual growth model. Finally, the value of the cash flows for the discrete period and the terminal value must be discounted back using the capital asset pricing model or "CAPM."[112]

In this case, the experts disagreed on each of these components—the projections to use for future cash flows, the terminal value, and the discount rate—and the components that make up each of those, in addition to the role of stock-based compensation. I describe the discrepancies in the inputs of Wisialowski and Jarrell, and their respective rationales, below.[113]

---

[110] *In re Orchard Enterprises, Inc.*, 2012 WL 2923305, at *12 (Del. Ch. July 18, 2012), *judgment entered sub nom. In re Appraisal of the Orchard Enterprises, Inc.* (Del. Ch. July 26, 2012), *judgment aff'd sub nom. Orchard Enterprises, Inc. v. Merlin Partners LP*, 2013 WL 1282001 (Del. Mar. 28, 2013); *see also Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *10 (Del. Ch. July 8, 2013), *judgment entered sub nom. Merion Capital, L.P v. 3M Cogent, Inc.* (Del. Ch. July 23, 2013).

[111] *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005).

[112] *Id.*

[113] I include a detailed factual recitation here, because the inputs are necessary to any principled attempt to reconcile the experts' widely divergent DCF analyses. The casual reader may wish to skip ahead to the discussion section of this Memorandum Opinion; she may find reading the remainder of the facts section reminiscent of eating chicken gizzards: plenty of chewing but mighty little swallowing.

## 2. Projections

Wisialowski developed a set of "blended" management projections, which weighted the Initial May Projections and October Scenario B equally. Wisialowski testified that his arrival at this weighting did not involve much precision.[114] He did not attempt to determine the probability of either projection occurring; instead, he testified at trial that he "was tempering—[he] was mixing the projections to say maybe they were half right on this growth rate and half right on this growth rate and put those together."[115] He explained: "What I try to do is come up with what I felt was a minimum defensible conservative valuation of the company."[116]

Jarrell, on the other hand, relied exclusively on the October Projections, weighting both October Scenarios equally.[117] He opined that the October Projections were more reliable because they incorporated bidder feedback, the

---

[114] Trial Tr. 470:16–19; Wisialowski Dep. 271:24–272:2; *see also* Wisialowski Dep. 273:20–274:4 ("Q. But I think actually if you were trying to determine what is the best estimate of the likely outcome in the future, you would have come up with something different? A. I think where I stand—where I stand today, having learned more about the business, I might revisit the mix, especially now that I see what the drivers are in terms of—in terms of what the underlying assumptions were in getting them.").

[115] Trial Tr. 470:12–15 (Wisialowski); *see also id.* 470:1–5, 20–23 (Wisialowski); *id.* at 471:9–17 (Wisialowski) ("There were other ways to get to a similar judgment, which was trying to temper this—if people believe that these are aggressive, there are three ways that you can reduce them. You can actually just pick a number. You can blend them with something that's in existence, which is what I ultimately did, or I can just scale the set of numbers and run it at a 90 percent or 80 percent or 70 percent realization. There's many ways to skin the cat."); *id.* at 472:15–20 ("I think Scenario B, when blended with the management projections, gives a conservative growth rate in revenues and a highly defensible, if not excessively conservative, margin, certainly at the EBITDA level, which would be a good estimation of the business prospects of the company.").

[116] *Id.* at 472:24–473:2 (Wisialowski).

[117] *Id.* at 573:12–17 (Jarrell); JX 209 ¶ 139.

realities of the auction process, and other information that management had learned since May; they were also closer to Wall Street estimates.[118]

### 3. Terminal Value

Calculating terminal value involves four key components: perpetuity growth rate, the EBIT margin, the "plowback" ratio, and the projected tax rate.[119]

As for perpetuity growth rate, Wisialowski adopted 3.0%, which he characterized as the most conservative assumption in his entire model.[120] Jarrell agreed that this was "on the low side," and adopted a 4.5% growth rate.[121] This difference did not garner much discussion at trial, comparatively speaking, as both choices could be seen as conservative for their respective sides. That is, had Wisialowski adopted a higher growth rate, his valuation could have been more favorable to the Petitioners; had Jarrell adopted a lower growth rate, his valuation could have been more favorable to the Respondent.

The remaining three components generated a more vigorous dispute.

First, Jarrell and Wisialowski disagreed as to whether it was necessary to normalize EBIT margins during the perpetuity period—Jarrell believed it necessary; Wisialowski did not. Normalization of EBIT margins is based on the

---

[118] *See id.* at. 571:8–573:5 (Jarrell).
[119] *See, e.g.,* Resp't's Opening Post-Trial Br. at 58; Trial Tr. 734:3–10 (Jarrell).
[120] *See* Trial Tr. 271:7–14 (Wisialowski).
[121] *See id.* at 733:15–22 (Jarrell).

idea that the EBIT projection for the last year of the projections period may not be appropriate to apply in perpetuity; as Jarrell explained at trial:

> The perpetuity period, in theory, is a period where you're in long-run competitive equilibrium. In long-run competitive equilibrium, there's a tendency for margins to be lower than they are in the forecast period because competition in the long run is more fierce than it is in the short run. Any barriers to entry that Ancestry has in the short run, owing to whatever advantages that they've generated, tend to erode in the long run rather than get better, and that reflects itself as competition for price, and the margin goes down.[122]

Thus, rather than apply the projected margin for the final year of the projections period in perpetuity, Jarrell averaged the projected margins and used that figure, which had been "normalized to a sustainable level," in calculating terminal value.[123]  He averaged the projected EBIT margins for 2013 through 2016 (as projected in Scenarios A and B), resulting in a normalized EBIT margin of 26.1% for Scenario A and 27.3% for Scenario B, as compared to the historical actual EBIT margin of 18.2% for the years 2004–2012, and the actual EBIT margin of 26.3% for the year 2012.[124]

The Petitioners criticized Jarrell's approach on two grounds, first asserting that normalization "was unnecessary given the pessimistic outlook already adopted by the Scenarios."[125]  Second, they contend, even if one were to normalize,

---

[122] *Id.* at 652:14–24 (Jarrell).
[123] JX 209 ¶ 193 & n.239–41.
[124] *Id.* ¶ 194 & Table 12.
[125] Merion Capital L.P.'s Post-Trial Br. at 72.

"normalized profit margins should reflect the *midpoint* of the company's business cycle," because "[a]s the company reaches a steady state, the cost structure evolves and becomes stable."[126] Because Ancestry had been growing, "the average margins used by Jarrell would not reflect a mid-point of its business cycle," and "Jarrell conducted no analysis to determine whether his EBIT margin assumption during the perpetuity period *was* the midpoint of Ancestry's business cycle."[127]

While criticizing Jarrell's approach, the Petitioners offered little in the way of substantive support of Wisialowski's approach, other than to characterize it as "appropriate[]," "given Ancestry's consistent trend of increasing margins."[128] Wisialowski used 38.8% in his terminal period calculation, which is his EBITDA margin projection for 2016, and is higher than any margin Ancestry ever achieved.[129] Wisialowski arrived at 38.8% by blending the projected EBITDA margins from the last projected year of each of the Initial May Projections and October's Scenario B.[130] Jarrell noted that, had Wisialowski normalized his EBITDA margins, his figure would have been 37.3%.[131] The effect of this discrepancy is to drive the terminal value, and thus the DCF, of the respective

---

[126] *Id.* (emphasis added).
[127] *Id.* (emphasis added).
[128] *Id.* at 71.
[129] Resp't's Opening Post-Trial Br. at 91.
[130] Trial Tr. 476:13–477:17 (Wisialowski); *see also id.* at 654:19–655:15 (Jarrell).
[131] *Id.* at 655:10–15 (Jarrell).

experts further apart; *i.e.*, the Petitioners' expert's valuation comes out higher, and the Respondent's expert's valuation comes out lower.[132]

Second, the experts arrived at different plowback ratios, which is the percentage of net operating profit after tax that is reinvested in capital expenditures. The idea is that "[i]n order to adequately support a perpetual growth rate in excess of expected inflation (*i.e.*, positive real growth), a firm will need to reinvest in capital expenditures at a sustainable rate that is above that of projected depreciation."[133] Jarrell's plowback ratio was 12% of his terminal period cash flows, which he arrived at by considering plowback for Scenarios A and B (12.1% and 11.5%, respectively), and the historical plowback, which was 11.9%.[134] In light of his 4.5% perpetuity growth rate, with 2% expected inflation, this 12% plowback ratio implied a return on investment of 22.8% going forward—"a very pro increases-value assumption." [135] By comparison, Wisialowski used a 4.8% plowback ratio and criticized Jarrell's higher figure.[136] Jarrell noted, however, that because of Wisialowski's 3% perpetuity growth rate, again assuming 2% expected inflation, Wisialowski's projected return on investment comes out to 22.6%;[137] in other words, the assumptions used by each expert result, essentially, in a wash.

---

[132] *See, e.g.*, *id.* at 656:3–14 (Jarrell).
[133] JX 209 ¶ 203.
[134] Trial Tr. at 658:2–9 (Jarrell).
[135] *Id.* at 661:20–21 (Jarrell).
[136] *See* JX 221 ¶¶ 149–51.
[137] *See* Trial Tr. at 662:15–24 (Jarrell)

Finally, as to projected tax rate, Jarrell used 38%, while Wisialowski used 35%. "This difference has a material effect on the valuation—if Jarrell had used a 35% tax rate, it would raise his valuation by $0.97; if Wisialowski used a 38% tax rate, [] it would lower his valuation by $1.17."[138] Jarrell's marginal tax rate figure is based on historical actual effective tax rates, which the Petitioners criticized as improper and not representative of the Company's future.[139] Jarrell defended his figure by suggesting that, although an average tax rate may be lower than a marginal rate, one cannot rely, in perpetuity, on whatever variables resulted in a lower tax rate in a given year.[140] He found it more reasonable to remain consistent with the Company's long-term historical average tax rate.[141] Wisialowski arrived at 35% by using 34%—a figure presented by PricewaterhouseCoopers in a presentation to Permira as to the likely tax rate "for the foreseeable future," but not explicitly a tax rate in perpetuity—and adding 1%, to "[be] conservative."[142]

### 4. Discount Rate

Wisialowski calculated a discount rate of 10.96%,[143] while Jarrell calculated 11.71%.[144] This resulted in a $4.27 per share difference in their valuations.[145] The

---

[138] Merion Capital L.P.'s Post-Trial Br. at 69.
[139] *Id.*
[140] *See* Trial Tr. 664:3–665:8 (Jarrell).
[141] *Id.* at 666:3–6 (Jarrell).
[142] *Id.* at 524:4–525:6 (Wisialowski).
[143] JX 212 ¶ 136.
[144] JX 209 ¶ 172.
[145] *See, e.g.,* Trial Tr. 351:20–22 (Wisialowski).

discrepancy turns largely on the experts' respective "beta"—that is, discount for risk based on the stock's movement as compared to the market—calculations; Wisialowski calculated beta of 1.107,[146] later updated to 1.095,[147] while Jarrell calculated 1.30.[148]

Key inputs in beta calculations include the market proxy, the observation period, and the sample period.[149] The experts used different inputs on all accounts, at least in their initial reports; they ultimately agreed on the most appropriate sample period, while remaining in disagreement over the market proxy and observation period.[150]

First, the experts used different market proxies in their regression analyses. Wisialowski "selected the beta resulting from the regression of ACOM [Ancestry stock] against the NASDAQ Composite for all data since its IPO on a weekly basis."[151] Wisialowski opted to use NASDAQ as the market proxy because he believed it to contain a number of companies similar to Ancestry. He then applied this beta to an *S&P 500-based* equity risk premium, though his report identified that a NASDAQ-derived beta should be multiplied by a NASDAQ equity risk

---

[146] JX 212 ¶ 113.
[147] JX 221 ¶ 178.
[148] *See, e.g.,* Trial Tr. 351:17–19 (Wisialowski).
[149] *See, e.g., id.* at 352:7–12 (Wisialowski).
[150] *See id.* at 352:7–354:4 (Wisialowski).
[151] JX 212 ¶ 128 (emphasis omitted).

premium.[152] Jarrell used the S&P 500 as his market proxy for the regression analysis.[153] In post-trial briefing, the Petitioners asserted that they "[do] not take issue with regressing Ancestry's weekly beta against the S&P 500 if a weekly observation period is used, which results in a beta of 1.137."[154]

Second, Wisialowski and Jarrell used different observation periods, which can be daily, weekly, or monthly. Wisialowski used a weekly observation period, while Jarrell used a monthly period. Wisialowski characterized this as the "biggest difference" in their respective calculations.[155] Wisialowski testified that many valuations use monthly data, but that, for Ancestry, this resulted in only 30 data points, whereas using 36 to 60 is recommended; thus, he used weekly data to generate more points.[156] Jarrell testified that daily or weekly trading prices can include statistical "noise" that affects the accuracy of the beta calculation, but noted that, "all else equal, the more observations, the better in terms of statistical precision."[157] He used a monthly period, which he described as "sort of the

---

[152] *See* JX 212 ¶ 136. At trial, he stated that this was a typo and that he intended to, and did, use a market equity risk premium. But he used a figure from Ibbotson's Yearbook, which was based on the S&P 500. *See* Trial Tr. 486:2–5 (Wisialowski); JX 219 ¶¶ 46–50.

[153] *See* JX 209 ¶ 179 & n.217.

[154] Merion Capital L.P.'s Post-Trial Br. at 66; *see also* Joinder of Pet'rs Merlin Partners LP and AAMAF, LP in Post-Trial Br.

[155] Trial Tr. 351:6–10 (Wisialowski).

[156] *Id.* at 353:2–23 (Wisialowski).

[157] *Id.* at 636:4–637:3 (Jarrell).

standard of the services,"[158] having found "noise" when he conducted further calculations.[159]

Third, while Wisialowski observed the period from the IPO through the date of the merger in his initial report, Jarrell excluded the period in which the auction process had become public. In his rebuttal report and at trial, Wisialowski conceded that Jarrell's approach was sound.[160] However, Wisialowski testified that when he adjusted the time period to use Jarrell's approach, his beta decreased, thus driving a further gap between the experts' calculations.[161]

### 5. Stock-Based Compensation

Wisialowski, in his initial DCF analysis, did not take into account Ancestry's practice of providing stock-based compensation ("SBC") to its employees.[162] Jarrell, by contrast, contends that a failure to account for SBC expenses within a DCF model may result in overvaluation.[163] Scenarios A and B

---

[158] *See id.* at 637:4–12 (Jarrell).
[159] *Id.* at 638:6–16 (Jarrell).
[160] JX 221 ¶ 175; Trial Tr. 481:3–13 (Wisialowski).
[161] Trial Tr. 352:19–23 (Wisialowski).
[162] *See* JX 221 ¶ 138.
[163] JX 209 ¶ 163. He cites multiple authorities for this point, but also notes that this Court previously held that a respondent had failed to demonstrate that SBC should be treated as a cash expense. *See id.* ¶¶ 165–67 (citing *Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896 Del. Ch. July 8, 2013), *judgment entered sub nom. Merion Capital, L.P v. 3M Cogent, Inc.* (Del. Ch. July 23, 2013)). Merion contends that Jarrell's SBC calculation is too speculative and that it is not otherwise an appropriate adjustment to a DCF model because it is "not an established approach in the valuation community or under Delaware law." *See* Merion Capital L.P.'s Post-Trial Br. at 50–51.

31

of the October Projections did not include projections for SBC, however; he instead used a figure—3.2% of revenues—taken from the May Projections.[164]

In his rebuttal report, Wisialowski "built a model to estimate the number of options granted each year and the future stock price of Ancestry in order to measure the cash flow required to eliminate any dilution from future option grants and their exercise."[165] For his model, he maintained his 50/50 weighting of the May Projections with Scenario B, but, as noted, because the October Projections did not include SBC projections, Wisialowski chose 1%, which he said was based on "total personnel expense and SBC of 23.5% for Scenario B, which is slightly higher than the combined figure for the [May Projections]."[166] Ultimately, he calculated a difference in share value of approximately $0.50.[167] Wisialowski explained that he decided

> not to include any impact for SBC in my DCF analysis because adding the future stock trading price adds yet another level of assumptions which are difficult to prove. That being said, I strongly believe that my estimates are conservative and Jarrell's are just plain wrong. I continue to believe that non-inclusion of SBC expense in FCF for purposes of a DCF-based valuation is the proper treatment and the treatment recognized by this Court.[168]

---

[164] Trial Tr. 723:1–8. *Compare* JX 29 (Initial May Projections), *and* JX 43 (May Sales Projections), *with* JX 170 (October Projections). *But see* Trial Tr. 723:20–724:3 (Jarrell) (noting also that "[n]othing below the EBITDA line was in the October projections"; they were missing other figures that had been included in the May Projections, including depreciation, capital expenditures, and tax rates).

[165] JX 221 ¶ 130.

[166] *Id.* ¶ 131; *see also* Wisialowski Dep. Tr. 449:1–7.

[167] JX 221 ¶ 134.

[168] *Id.* ¶ 138.

## II. PROCEDURAL HISTORY

Following the announcement of the merger, several plaintiffs filed actions in this Court, alleging, among other things, that the merger price was inadequate and the sales process was flawed. In November, these actions were consolidated, and on December 17, 2012, then-Chancellor Strine heard oral argument on the plaintiffs' motion for a preliminary injunction. He denied this motion from the bench.[169] In March 2013, these plaintiffs then filed an amended complaint, which the defendants moved to dismiss. Oral argument was held on September 27, 2013, with then-Chancellor Strine granting the defendants' motion following argument.[170]

On January 3, 2013, Merion filed a Verified Petition for Appraisal pursuant to 8 *Del. C.* § 262. Also on January 3, the Merlin Petitioners filed a Petition for Appraisal of Stock. On June 24, these actions were consolidated. Collectively, the Petitioners owned 1,415,000 shares of common stock as of the Merger Date.

On May 9, 2014, shortly before trial, Ancestry filed a Motion for Summary Judgment, arguing that Merion lacked standing because it could not demonstrate that its shares were not voted in favor of the merger. I postponed consideration of

---

[169] *See In re Ancestry.com Inc. S'holder Litig.*, C.A. 7988-CS (Del. Ch. Dec. 17, 2012) (TRANSCRIPT).

[170] *See In re Ancestry.com Inc. S'holder Litig.*, C.A. 7988-CS (Del. Ch. Sept. 27, 2013) (TRANSCRIPT).

that Motion until after full briefing and oral argument, which was completed in October. I denied the Motion in a Memorandum Opinion dated January 5, 2015.[171]

## III. APPRAISAL ANALYSIS

*A. The Appraisal Standard*

Characterized as, at one time, a liquidity option and, more recently, as a check on opportunism, the appraisal statute allows dissenting stockholders to receive judicially-determined fair value of their stock.[172] After determining that appraisal petitioners have standing, as I have done here,[173]

> the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.[174]

"Appraisal is, by design, a flexible process."[175] Section 262 "vests the Chancellor and Vice Chancellors with significant discretion to consider 'all relevant factors' and determine the going concern value of the underlying company."[176] Our Supreme Court has declined to "graft common law gloss on the statute," in light of the General Assembly's determination that this Court's consideration of "all

---

[171] *See In re Appraisal of Ancestry.com, Inc.*, 2015 WL 66825 (Del. Ch. Jan. 5, 2015).

[172] *See id.* at *3–4 (providing a brief history of the appraisal statute in Delaware).

[173] As noted, Ancestry argued that Merion lacked standing, and moved for Summary Judgment as to Merion's Petition. I denied that Motion, finding that Merion has met the statutory prerequisites of Section 262. *See id.* Ancestry does not challenge the Merlin Petitioners' standing.

[174] 8 *Del. C.* § 262(h).

[175] *Global GT LP v. Golden Telecom, Inc.*, 11 A.3d 214, 218 (Del. 2010).

[176] *Id.* at 217–18 (quoting 8 *Del. C.* § 262(h)).

34

relevant factors" is fair, albeit imperfect.[177]  Thus, and in the absence of "inflexible rules governing appraisal,"[178] "it is within the Court of Chancery's discretion to select one of the parties' valuation models as its general framework, or fashion its own, to determine fair value in the appraisal proceeding."[179]

Although the Supreme Court "has defined 'fair value' as the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction,"[180] this Court has relied on the merger price as an indicia of fair value, "so long as the process leading to the transaction is a reliable indicator of value and merger-specific value is excluded."[181]  In fact, this Court has held, where

> the transaction giving rise to the appraisal resulted from an arm's-length process between two independent parties, and [] no structural impediments existed that might materially distort "the crucible of objective market reality," a reviewing court should give substantial evidentiary weight to the merger price as an indicator of fair value.[182]

*B. Ancestry's Fair Value*

In an appraisal action, as pointed out above, "[b]oth parties bear the burden of establishing fair value by a preponderance of the evidence," which effectively

---

[177] *Id.* at 217.

[178] *Id.*

[179] *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del. 1996).

[180] *Golden Telecom*, 11 A.3d at 217.

[181] *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *9 (Del. Ch. Nov. 1, 2013) (internal quotation marks omitted); *see also Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del. Ch. 2007).

[182] *Highfields Capital*, 939 A.2d at 42.

means that neither party has the burden, and the burden instead falls on this Court.[183]  Upon consideration of the sales process, the experts' opinions, and my own DCF analysis, conducted in light of certain concerns with both experts' analyses, I find that Ancestry's value as of the Merger Date is $32.  To explain that conclusion, I turn first to the evidence of valuation reflected in the market price.

### 1. The Sales Process

The sales process was reasonable, wide-ranging and produced a motivated buyer.  It has been approved of, as free from the taint of breaches of fiduciary duty, by this Court.  In a bench ruling denying motion for a preliminary injunction, then-Chancellor Strine noted that: "The process looked like they segmented the market carefully, logical people were [brought] in, a competent banker who appears at every turn to have done sensible things, ran it."[184]  The Court characterized that process as one "that had a lot of vibrancy and integrity":

> I think they tried to kick the tires.  I think that even when I look at the communications by Mr. Sullivan, I think they were trying to get these buyers to pay as full a price as possible.  They were trying to create a competitive dynamic.  Given that and given the ability of stockholders

---

[183] *Huff Fund*, 2013 WL 5878807, at *9; *see also Highfields Capital*, 939 A.2d at 42–43 ("[I]f neither party adduces evidence sufficient to satisfy this burden, the court must then use its own independent judgment to determine fair value."); *In re Orchard Enterprises, Inc.*, 2012 WL 2923305, at *5 (Del. Ch. July 18, 2012) ("[T]he court may not adopt an 'either-or' approach to valuation and must use its own independent judgment to determine the fair value of the shares.") *judgment entered sub nom. In re Appraisal of the Orchard Enterprises, Inc.* (Del. Ch. July 26, 2012) and *aff'd sub nom. Orchard Enterprises, Inc. v. Merlin Partners LP*, No. 470, 2012, 2013 WL 1282001 (Del. Mar. 28, 2013).

[184] *In re Ancestry.com Inc. S'holder Litig.*, C.A. 7988-CS, at 210:22–211:1 (Del. Ch. Dec. 17, 2012) (TRANSCRIPT).

to vote for themselves, I'm disinclined to take it out of their hands. . . . I think given the market test that was done here, I'm poorly positioned to take that risk for [the stockholders], and I'm not prepared to do so.[185]

In dismissing the amended complaint pursuant to Court of Chancery Rule 12(b)(6), the Court concluded that "the plaintiffs have not pled facts that raise an inference that any of the director defendants, much less a majority of them, suffered from disabling conflicts that would give rise to a breach of the duty of loyalty."[186] In considering the process as a whole, which the Court characterized as "logical" and as "an open door to a range of people,"[187] and, specifically addressing Spectrum's and management's equity rollovers, the Court concluded, "[P]ut simply, there's no non-conclusory factual allegations in the complaint from which I can conceivably infer that Spectrum, Sullivan, or Hochhauser, or any of the Ancestry directors, had any conflict of interest."[188]

Of course, a conclusion that a sale was conducted by directors who complied with their duties of loyalty is not dispositive of the question of whether that sale generated fair value.[189] But the process here, described in full earlier in this

---

[185] *Id.* at 232:5–233:4.

[186] *In re Ancestry.com Inc. S'holder Litig.*, C.A. 7988-CS, at 73:14–18 (Del. Ch. Sept. 27, 2013) (TRANSCRIPT).

[187] *Id.* at 80:7–9.

[188] *Id.* at 95:4–8.

[189] I note that Ancestry had a charter provision exculpating directors for breaches of the duty of care; the actions of the board, therefore, were not even reviewed in the fiduciary duty action for *gross negligence* in the conduct of the sale. Nothing in the record before me, however, leads me to the conclusion that the sales process was fundamentally flawed.

Memorandum Opinion, appears to me to represent an auction of the Company that is unlikely to have left significant stockholder value unaccounted for.[190] On the other hand, as is typical in a non-strategic acquisition, I find no synergies that are likely to have pushed the purchase price above fair value. The Defendant's expert, although arguing that fair value is somewhat below the sales price, concedes as much.[191]

It is within that context of the auction process, which generated a sale price of $32 per share, that I turn first to a significant issue in Ancestry's valuation—its projections—before turning to the evidence of value by way of the experts' opinions.

---

[190] The Petitioners and Wisialowski argue that the merger price was ultimately the product of a financing issue, rather than a valuation issue. *See, e.g.*, JX 212 ¶¶ 54–55; Merion Capital L.P.'s Post-Trial Br. at 82. In support, they point to an email between Sullivan and Turner during the negotiation process, in which Sullivan colorfully describes his stance on the ongoing negotiations, and also stated, "[W]e have taken [Permira] at [its] word for several months that [its] inability to do a deal at $33 was primarily a source of funds question . . . rather than a valuation question." JX 162. As Sullivan explained at trial, that email also shows that, in order to "call [Permira's] bluff" that it would not pay more than it had previously offered, supposedly because it could not obtain financing, management and Spectrum would roll over a larger portion of their equity, thus driving up the price Permira was willing to pay. *See* Trial Tr. 38:9–24 (Sullivan). I found Sullivan's testimony on the context of this email credible, and I do not think his statement about financing should be afforded the weight the Petitioners suggest, particularly when taken in light of the broader context of the auction that produced no buyer willing to pay more.

[191] Jarrell opined, "Since Permira is a financial acquirer and not a strategic partner, the $32 merger price presumably does not contain any significant synergies that might result from combining the operations of Ancestry with any complementary operating business." JX 209 ¶ 107. He went on further to discuss certain "public-to-private cost savings," which he estimated to be $0.11 per share, but did not deduct them from the merger price since he was unable to determine whether the savings were included in it.

## 2. Company Projections

Both sets of projections that formed the basis of discounted cash flow analyses and provided the underpinnings of the experts' respective valuations are imperfect. Ancestry's management made no business projections in the regular course of business; its first set of long-term projections, the Initial May Projections, were made aggressive to bolster a potential sale of the company and revised after encouragement by the board to be even more aggressive, resulting in the May Sales Projections.[192] Notably, one particular assumption underlying these projections—that churn would decrease over time—was directly called into question by potential bidders during their due diligence processes.[193]

The October Scenarios are also questionable. They were made in light of an understanding that the May Projections could not support a fairness opinion for the proposed transaction and at a time when management was contemplating large rollovers of their own positions in Ancestry stock. I note that at the same time management was creating the October Scenarios, the CEO was doing private projection "hacks," anticipating joyfully a possible growth rate for his rollover interest substantially greater than those management projections. Nonetheless, I find the Scenarios more reliable than the May Projections. Testimony indicated that the October Scenarios were management's best estimates as of the time of the

---

[192] *See, e.g.*, Trial Tr. 133:2–6 (Hochhauser).
[193] *See id.* at 143:8–144:18 (Hochhauser).

merger. They included hard numbers, rather than projections, for several additional months of data compared to the May Projections. The Scenarios also took into account feedback from the Company's financial advisor, relayed from bidders, that the May Projections were too optimistic.

It is within this context that I turn to the experts' analyses. The Petitioners' expert, Wisialowski, contended that the May Sales Projections were so unsupportably rosy that potential investors lost confidence in management; thus, he focused instead on the Initial May Projections. The Initial May Projections were not approved by the board and were not presented to bidders. Notably, the Initial May Projections that the Wisialowski champions were only marginally more conservative than the May Sales Projections he rejects.[194] Notwithstanding his support for the Initial May Projections, I conclude that Wisialowski believed that a DCF based on the Initial May Projections alone (which, again, he contended to be the more conservative of the May Projections) would itself be unsupportably

---

[194] Wisialowski found the May Sales Projections sufficiently divorced from reality that he opined that, in his view, they may have so alienated potential bidders that they resulted in decreased competition and an artificially low sales price, a proposition I find dubious, but interesting in light of his acceptance of the similar Initial May Projections. *See* Trial Tr. 260:13–24 (Wisialowski); JX 221 ¶ 197 ("[T]he lack of credibility caused by the fact that the [May Sales] Projections could not be described as a 50/50 case, but instead were described by Qatalyst as 'stretchy' further reduced the likelihood of realizing a full price."). It seems to me implausible that private equity investors' sensibilities are so tender that, upon diligence revealing that management was engaged in puffing in its forecasts, the investors would walk away, leaving tens or hundreds of million dollars on the table in a fit of pique.

high.[195]  Ultimately, he used a blended projection from the Initial May Projections and the better case October Scenario, which Scenario he contended was tainted and unsupportably low,[196] yet still incorporated into his valuation.  It is unclear how "blending" two unsupportable sets of projections gives a number on which this Court can rely.[197]

The Respondent's expert, Jarrell, relied solely on the October Projections, because management represented them as the best prediction as of the date of the merger.  Again, I note that those projections were (1) not developed in the ordinary course of business, (2) done in light of the information that the banker would be unable to provide a fairness opinion based on management's May Projections, and (3) done at a time when management knew that it would be rolling over its own equity in the company rather than being cashed out.  Therefore, a DCF based on these projections leaves room for doubt.  That said, this Court has recognized that management is, as a general proposition, in the best position to know the business and, therefore, prepare projections; "in a number of cases Delaware Courts have relied on projections that were prepared by management outside of the ordinary course of business and with the possibility of litigation."[198]  As described below,

---

[195] *See* Trial Tr. 428:18–429:24 (Wisialowski).
[196] *See, e.g., id.* at 439:9–440:12 (Wisialowski).
[197] *See, e.g., id.* at 470:1–19 (Wisialowski).
[198] *See, e.g., Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *11 (Del. Ch. July 8, 2013), *judgment entered sub nom. Merion Capital, L.P v. 3M Cogent, Inc.* (Del. Ch. July 23, 2013).  *But see id.* (noting that it has also declined to afford that deference where "management

therefore, and despite the factors that make the October Projections problematic, I find that an equal weighting of the Scenarios is a better platform on which to base a DCF analysis than a blend of the Initial May Projections and the best case October Scenario, as employed by Wisialowski.

### 3. DCF Analysis

While I will not burden this Memorandum Opinion by reciting the qualifications of the competing experts here, I note that both are respected in their field, and well qualified to offer valuation opinions. That said, I find each respective approach less than fully persuasive. It is clear to me that the Petitioners' expert tailored his DCF analysis by blending together what he described as the "unbelievable" best case October Scenario[199] with the Initial May Projections simply in order to come up with a number that was "defensible"[200]—that is, higher than the merger price, but not astronomically so as would have been the case if he used the more "reliable" projection alone. The Respondent's expert candidly suggested that, if he had reached a valuation that departed from the merger price by as much as the Petitioners' expert, he "would have to tried to find out a way to reconcile those two numbers," in other words, he would have tailored his analysis

---

had never prepared projections beyond the current fiscal year, the possibility of litigation, such as an appraisal proceeding, was likely, and the projections were made outside of the ordinary course of business").

[199] *See* Trial Tr. 442:8–10 (Wisialowski) ("Q. Okay. So it was your view that the entire scenarios were a sham? A. I don't believe them.").

[200] *See, e.g., id.* at 446:3–11 (Wisialowski).

to fit the merger price.[201] Neither of these approaches gives great confidence in the DCF analysis of either expert, since both appear to be result-oriented riffs on the market price.[202] Ultimately, I am faced with an appraisal action where an open auction process has set a market price, where both parties' experts agree that there are no comparable companies to use for purposes of valuation, and where management did not create projections in the normal course of business, thus giving reason to question management projections, which were done in light of the transaction and in the context of obtaining a fairness opinion. As Wisialowski repeatedly testified, he saw it as his job to "torture the numbers until they confess[ed]."[203] I note that (beyond any moral concerns) it is well-known that the problem with relying on torture is the possibility of *false* confession.[204] Accordingly, my own analysis of the value of Ancestry follows.

While the concept of a DCF valuation—that value is derived from the sum of future revenue discounted to present value—is quite simple, the calculation

---

[201] *See id.* at 459:24–560:11 (Jarrell). My comments should not be read as a criticism of Jarrell, who I found to be a candid and sincere witness; they are instead in recognition of the limitations of a post-hoc DCF analysis, in general. If an analysis, relied upon to assess whether a sales price represents fair value, in turn uses that very sales price as a check on its own plausibility, and if it must be revised if it fails that check, then the process itself approaches tautology.

[202] *See Joseph v. Shell Oil Co.*, 482 A.2d 335, 341 (Del. Ch. 1984) ("Reasonable [minds] can differ as to opinions as to value. Indeed, the Court is well aware that expert appraisers usually express different opinions as to value even when they use the same data for arriving at their opinion. And it is not unusual that an expert appraiser will express a higher value if he has been hired by the plaintiff than if he has been hired by the defendant.").

[203] Trial Tr. 226:5-6 (Wisialowski); *id.* at 229:1–2 (Wisialowski); *id.* at 445:5–6 (Wisialowski).

[204] *See, e.g.,* John McCain, *Bin Laden's Death and the Debate over Torture*, Wash. Post, May 11, 2011, http://www.washingtonpost.com/opinions/bin-ladens-death-and-the-debate-over-torture/2011/05/11/AFd1mdsG_story.html.

43

itself is complex. The following discussion is laden with formulas through which the discount rate and terminal value are arrived at. I freely admit that the formulas did not spring form the mind of this judge, softened as it has been by a liberal arts education. Footnotes indicate the derivation of each, principally taken from the reports of the experts. I also found Vice Chancellor Parsons' lucid explanation of calculations of value via discounted cash flow in *Merion Capital, L.P. v. 3M Cogent, Inc.*[205] helpful. Although I will address, with specificity, the experts' contentions and my findings with respect thereto, I find that, as a general matter, Jarrell was more credible and his analysis is more likely to result in a fair value of Ancestry. I diverge with him on two significant points: first, his beta calculation, and specifically, his use of a monthly observation period; and second, his use of a 4.5% growth rate coupled with a 12% plowback ratio. I will discuss my findings as they specifically relate to the evidence offered by the two experts, but I am largely adopting the methodology advanced by Jarrell. Employing that methodology, my valuation of Ancestry as of the Merger Date, based solely on a DCF analysis, is $31.79.

As an initial matter, the parties dispute whether a two-stage or three-stage discounted cash flow method is most appropriate. This issue turns largely on the projections upon which I rely, and, as discussed below, I rely on the October

---

[205] 2013 WL 3793896 (Del. Ch. July 8, 2013), *judgment entered sub nom. Merion Capital, L.P v. 3M Cogent, Inc.* (Del. Ch. July 23, 2013).

Projections in my analysis. Accordingly, I agree here with Jarrell that a three-stage model is unnecessary. [206]

### a. Projections

Driving the bulk of the substantial valuation differential between the analyses performed by Jarrell and Wisialowski is the key input: management projections. Jarrell relies on the October Scenarios, despite evidence suggesting that they were produced in light of the need to justify the sales price. Wisialowski, on the other hand, created his own projections, by blending the Initial May Forecast with the best case October Scenario, presumably because relying solely on the Initial May Forecast—which Wisialowski touts as the most reliable—would produce a valuation so high as to be likely rejected out-of-hand. The evidence suggests that the May projections were created to drive a high sales price; like the October Scenarios, they were not created in the ordinary course of business.

This Court has expressed skepticism in past cases as to management-prepared projections when those projections are not made in the ordinary course, and are instead made in contemplation of the sale of the company. [207] But management is uniquely situated in its knowledge of the Company, and while management projections are imperfect, hindsight-driven post hoc "projections" are

---

[206] *See, e.g.,* JX 212 ¶¶ 89–91 & n.45. In using the October Projections there is not the same substantial "step down" in growth rate from the projection period to the perpetuity growth rate about which Wisialowski was concerned in using his blended projections. *See* JX 219 ¶¶ 78–84.
[207] *See supra* note 198 and accompanying text.

more so; notably, both experts here rely on (different) management projections. Thus, and for the reasons set out above, I find it most appropriate here to rely upon the October Scenarios, as Jarrell did. These projections represented management's best view of the Company,[208] and as discussed above, I do not find the May Projections to be reliable. Therefore, I will rely exclusively on the October Projections, weighing Scenarios A and B at 50% each because management declined to present either Scenario as more likely.

### b. Terminal Value

The experts disagreed as to the appropriate perpetuity growth rate, but Jarrell pointed out that, in light of their respective plowback ratios, the differences were not particularly significant. That is, with Jarrell's perpetuity growth rate and plowback ratio, the rate of return on investment would be 22.8%, while Wisialowski's figures would generate a 22.6% return on investment. Ultimately, in light of this Court's prior methodology, where it has assumed zero plowback, and Jarrell's forthright statement that Wisialowski's lower plowback rate was reasonable in relation to his lower growth rate, I am adopting Wisialowski's figures, a 3% growth rate and 4.8% plowback, here.[209]

---

[208] I rely on the Scenarios for my DCF analysis for the reasons I have described, despite their preparation in light of the fact that the May Projections might not have supported a fairness opinion, and not withstanding their deviation from the CES's own "hacks;" in other words, the October Scenarios are the best of the imperfect projections here.

[209] *See* Trial Tr. 663:21–664:2 (Jarrell).

The more significant of their disputes concerns the normalization of EBIT margins. Jarrell found it important to normalize, while Wisialowski did not; the Petitioners argue that normalization was not necessary given the pessimistic view of the Scenarios Jarrell used. Because I find the October Projections to be management's best view of the Company going forward, not necessarily a pessimistic one, normalization is appropriate.[210] I find Jarrell's averaging of the 2013 through 2016 EBIT margin projections, which figure was then used as his future projection, appropriate. This results in a normalized EBIT margin of 26.1% for Scenario A and 27.3% for Scenario B.

Finally, the experts disagreed over the appropriate tax rate. Although I sympathize with the Petitioners' contention that few (if any) companies pay their marginal tax rates in perpetuity, it strikes me as overly speculative to apply the current tax rate in perpetuity. I agree with this Court's approach in *Henke v. Trilithic Inc.* to use the marginal tax rate "[b]ecause of the transitory nature of tax deductions and credits."[211]

Because I find weighted average cost of capital ("WACC") to be 10.71%, as discussed below, and I am otherwise adopting Jarrell's methodology here, including his calculation of NOPAT that includes a working capital adjustment,

---

[210] And although the Petitioners criticize Jarrell's calculation for failing to determine whether his projected normalized margins represent the midpoint of the Company's business, I find that criticism unhelpful here, in light of the lack of a proposed alternative methodology.
[211] 2005 WL 2899677, at *9 (Del. Ch. Oct. 28, 2005).

also discussed below,[212] the terminal value is calculated using the perpetuity growth model as follows[213]:

$$\text{Terminal Value} = \frac{(\text{NOPAT}_{2017})(1 - \text{Plowback Rate})}{(\text{WACC-Growth Rate})}$$

Thus, the Terminal Value for Scenario A is $1,538.51 million; for Scenario B it is $1,692.86 million. As discounted to the present value as of the Merger Date, the Terminal Value is $1,077.57 million for Scenario A and $1,185.68 million for Scenario B.[214]

### c. Discount Rate

I cannot adopt either expert's discount rate in full. In calculating beta, Wisialowski used NASDAQ as the market proxy; I find that the S&P 500 is a more suitable market proxy in light of its broader sampling of the market. Wisialowski also initially used an inappropriate measurement period, running through the Merger Date, which failed to account for increases in stock price once the auction process became public. I find that Jarrell, on the other hand, should have used weekly data, rather than monthly, to generate a larger sample size, notwithstanding his assertion that *daily* inputs involved statistical "noise." Jarrell's monthly data

---

[212] *See infra* text accompanying notes 229, 230.

[213] *See* JX 209 ¶¶ 192–211.

[214] To discount to present value, I divided the terminal value calculated above by 1.1071 (1+WACC), raised to the 3.5 power representing the time between the calculated terminal value and the Merger Date.

generated 30 data points, to which he attributes a 99% confidence level.[215] However, the valuation literature suggests using at least 36 data points, with some sources suggesting at least 60,[216] and Jarrell did not adequately explain why, specifically, a weekly input would be inappropriate here.[217]

Using a weekly observation period, S&P 500 as the market proxy, and an observation period from the Company's IPO through June 5, 2012, just before news of the auction broke, I find beta to be 1.137.[218]

The parties agreed that the appropriate risk-free rate is 2.47%, but disagreed as to the equity risk premium. While both agreed that a supply-side equity risk premium from the Ibbotson Yearbook is appropriate, they disagree as to which years of data to use. Wisialowski relied upon the 2013 Yearbook, which included data from 1926 through 2012, to derive an ERP of 6.11%. Jarrell used the 2012 Yearbook, containing data from 1926 through 2011, to derive an ERP of 6.14%.

---

[215] JX 209 ¶ 179 & n.220.

[216] *See, e.g.,* Trial Tr. 353:12–23 (Wisialowski).

[217] I note that Jarrell took the extra step of calculating a daily sum beta to compare his monthly beta to a daily beta, and found, after that analysis, "noise" in the daily beta calculation. But it is not clear why he did not consider (or, if he did, why he did not include in his report) the effect of weekly data. *See* JX 209 ¶ 179. In his rebuttal, Jarrell identified "three significant flaws" from which Wisialowski's beta suffered; none of them involved Wisialowski's use of weekly data. *See* JX 219 ¶ 36.

[218] The Petitioners have helpfully conceded that they are not opposed to my use of 1.137 as beta. *See* Merion Capital L.P.'s Post-Trial Br. at 66; Joinder of Pet'rs Merlin Partners LP and AAMAF, LP in Post-Trial Br.

This same disagreement as to the proper edition of Ibbotson's underlies the experts' disagreement as to the appropriate equity-size premium. Wisialowski, relying on the 2013 Yearbook, reached a premium of 1.73%, while Jarrell, relying on the 2012 Yearbook, reached a 1.75% premium. At trial, Jarrell testified that he used the 2012 edition because the Merger Date was December 28, 2012, and it is his practice to use the data that would have been available to investors as of the merger date; the 2013 Yearbook itself would not be available until after the merger closed. He candidly stated, however, that this was "not a big deal" and that he understood why Wisialowski would use the newer book.[219] The Petitioners argued in post-trial briefing that the 2013 Yearbook was more appropriate because it included "data from 2012 that—with the exception of a single trading day—was known or knowable on December 28, 2012."[220] Ultimately, I agree with Wisialowski's approach to use actual data available in the 2013 edition, especially since the Merger Date was so close to the end of the year and the 2013 edition would not have contained any information not available as of the Merger Date, aside from one day of trading information.

Jarrell assumed 5% debt in Ancestry's capital structure; Wisialowski did not include any. The Petitioners contend that had Wisialowski included 5% debt, his valuation would have increased by $0.38, and thus, they do not object to my use of

---

[219] Trial Tr. 629:5–19 (Jarrell).
[220] Merion Capital L.P.'s Post-Trial Br. at 67.

Jarrell's capital structure assumption.[221]  Under Jarrell's assumptions, the cost of debt is 3.81%.[222]  He also applied a 38% tax rate, which, as discussed above, I find to be appropriate.

Both experts calculated the discount rate using the WACC methodology, which I therefore adopt.  WACC is calculated as follows[223]:

$$WACC = [K_D \text{ x } W_D \text{ x } (1 - t)] + (K_E \text{ x } W_E)$$

Where :

$K_D$ = Cost of debt capital = 3.81%
$W_D$ = Average weight of debt in capital structure = 5%
$t$ = Effective tax rate for the company = 38%
$K_E$ = Cost of equity capital = 11.15%, as calculated below
$W_E$ = Average weight of equity capital in capital structure = 95%

To calculate the cost of equity capital, both experts used the Capital Asset Pricing Model ("CAPM"), which is calculated as follows:

$$K_E = R_F + (\beta \text{ x } R_{ERP}) + R_{ESP}$$

Where:

$R_F$ = Risk-free rate = 2.47%
$\beta$ = Beta = 1.137
$R_{ERP}$ = Equity risk premium = 6.11%
$R_{ESP}$ = Equity size premium = 1.73%

$K_E$ = 11.15%

[221] *Id.* at 60.
[222] JX 209 Ex. 17.
[223] These formulas were helpfully laid out in *Merion Capital LP v. 3M Cogent, Inc.*, 2013 WL 3793896, at *14 (Del. Ch. July 8, 2013), *judgment entered sub nom. Merion Capital, L.P v. 3M Cogent, Inc.* (Del. Ch. July 23, 2013).

Thus, *WACC* = [.0381 x .05 x (1-.38)] + (.1115 x .95) = .1071, or 10.71%

### d. Stock-Based Compensation

As an internet-based company, Ancestry is not alone in its practice of compensating employees heavily with stock. The effect of that practice is significant in a valuation of such a company. Jarrell included SBC in his valuation by deducting the non-cash stock expense from EBIT, treating it as tax deductible to approximate the anticipated deductions when options are exercised, and not adding this expense back.[224] Jarrell used the projected SBC as a percentage of revenue item from the May Sales Projections and the 2012 full-year forecasted results from mid-December 2012, both of which amounted to 3.2%, and applied this to Scenarios A and B, and into perpetuity.[225]

The Petitioners point out that this approach has not yet been endorsed by this Court. In fact, in *Merion Capital, L.P. v. 3M Cogent, Inc.*, Vice Chancellor Parsons rejected that respondent's contention that SBC should be treated as a cash expense, having found it to have failed to show that SBC would "have any effect on the actual cash flows of the Company."[226] Nevertheless, the Court agreed that "it makes sense to adjust earnings to take into account the dilutive effect of

---

[224] *Id.* at ¶ 164 & n.195.
[225] *Id.* at ¶ 159.
[226] 2013 WL 3793896, at *13.

SBC."[227] To that end, Wisialowski's rebuttal report attempted to consider the dilutive effect of SBC using a self-created model, but ultimately declined to "include any impact for SBC in [his] DCF analyses."[228]

What is clear to me is that, once it reaches a material level, SBC must in some manner be accounted for in order to reach a reasonable calculation of fair value. The real dispute is how to do so, whether by measuring its dilutive effect or by accounting for it in expenses. Here, the Petitioners dispute Jarrell's approach, but do not offer a reliable alternative for my consideration. I find Jarrell's approach to be reasonable, and I am adopting it here.

### e. Other Issues Bearing on Enterprise Value

On several other points, the experts diverged, to varying degrees, some of which are alluded to in my analysis above. First, Wisialowski excluded deferred revenues as part of free cash flows, which would have otherwise increased his value by $2.89 per share. Jarrell advocated for including them in free cash flows as a necessary working capital item needed "to adjust accounting data to cash flow data."[229] The Petitioners contend Wisialowski "took the objective and correct route of excluding deferred revenues, which had the impact of lowering his per-

---

[227] *Id.*

[228] JX 221 ¶ 138.

[229] Jarrell Dep. at 345:4–23; *see also* Trial Tr. 272:5–9 (Wisialowski); JX 216 ¶ 154.

share valuation."[230] I presume, from this statement, that the Petitioners do not object to my adherence to Jarrell's approach on this matter.

Second, as to excess cash added to the DCF value, Jarrell's figure was $32.9 million, using the Company's cash position minus its debt on December 31, 2012. Wisialowski's used $14 million, calculated based on a 2013 Permira report, indicating $44 million cash at closing, from which he subtracted his estimated four weeks' operating expenses of $30 million. In post-trial briefing, the Petitioners submitted that they "[have] no objection to the Court's use of Jarrell's excess cash assumption."[231]

Finally, while Wisialowski did not initially estimate the value of the Company's net operating losses, the experts ultimately agreed that the present value of NOL tax shields is $4.4 million.[232] "Merion does not object to including the value of Ancestry's NOLs in the Court's determination of the fair value of Ancestry's stock as of the Valuation Date."[233]

These three topics, while not generating as much dispute as other components of the valuation analysis, are nevertheless important to the valuation because of their bearing on enterprise value. I ultimately find, based on my review

---

[230] Merion Capital L.P.'s Post-Trial Br. at 58–59.
[231] *Id.* at 59; *see also* Joinder of Pet'rs Merlin Partners LP and AAMAF, LP in Post-Trial Br.
[232] *See* JX 209 ¶ 153; JX 216 ¶ 157.
[233] Merion Capital L.P.'s Post-Trial Br. at 57; *see also* Joinder of Pet'rs Merlin Partners LP and AAMAF, LP in Post-Trial Br.

of the experts' reports and trial testimony, Jarrell's approach on these topics to be the most reasonable, and I adopt his methodologies.

### f. My Valuation Results

Ancestry's calculated equity value is the sum of its enterprise value plus net cash. Its enterprise value is the sum of the present value of free cash flows during the projection period, the present value of the NOL tax benefit, and the present value of the terminal value based on constant growth.[234]

Using a DCF analysis, for Scenario A, I calculated $30.33 as the price per share. For Scenario B, I calculated $33.24 as the price per share. Weighted equally, the value derived from discounted cash flow is $31.79.[235] The actual market price as determined by the sale is $32. These are the two competing

---

[234] *See, e.g.*, JX 209 ¶ 214.

[235] In the interest of transparency, my calculations are as follows:
Enterprise Value = DCF + PV of NOL tax benefit + PV of Terminal Value. *See, e.g.*, JX 209 ¶ 214. The DCF is based on the October Projections, discounted to the mid-year. The parties agree upon my use of $4.4 million for the PV of NOL tax benefit. *See supra* note 233. Thus, with numbers expressed in millions of dollars:

Enterprise Value$_A$ = 355.31 + 4.4 + 1077.57 = 1437.28
Enterprise Value$_B$ = 393.51 + 4.4 + 1185.68 = 1583.59

Equity Value = Enterprise Value + Net Cash. *See, e.g.*, JX 209 ¶ 214. The parties agree on my use of $32.9 million for net cash. *See supra* note 231. Thus, with numbers expressed in millions of dollars:

Equity Value$_A$ = 1437.28 + 32.9 = 1470.18
Equity Value$_B$ = 1583.59 + 32.9 = 1616.49

The per-share price is determined by adding the Equity Values, above, to the cumulative exercise proceeds of options outstanding, then dividing that sum by the number of fully diluted shares. *See* JX 209 Ex. 19. Thus:

$$\text{Price per share [Scenario A]} = \frac{1470.18 \text{ million} + 56.1 \text{ million}}{50{,}317{,}969} = \$30.33$$

$$\text{Price per share [Scenario B]} = \frac{1616.49 \text{ million} + 56.1 \text{ million}}{50{,}317{,}969} = \$33.24.$$

valuations that the statutory "all relevant factors" directive charges me to take into account. The question becomes, should I rely on the DCF to reach fair value, using what appears to be a relatively untainted market-derived valuation as a check, or should my analysis be the reverse? Because the inputs here, the October Scenarios (as well as the alternative May Projections) are problematic for the reasons addressed at length above, and because the sales process here was robust,[236] I find fair value in these circumstances best represented by the market price. The DCF valuation I have described is close to the market, and gives me comfort that no undetected factor skewed the sales process. I note that my DCF value—while higher than Jarrell's—is still below that paid by the actual acquirer without apparent synergies; it would be hubristic indeed to advance my estimate of value over that of an entity for which investment represents a real—not merely an academic—risk, by insisting that such entity paid too much.

## V. CONCLUSION

For the foregoing reasons, I find that the merger price of $32 is the best indicator of Ancestry's fair value as of the Merger Date. The Petitioners are entitled to interest at the legal rate. The parties should confer and submit an appropriate form of order consistent with this Opinion.

---

[236] *See In re Ancestry.com Inc. S'holder Litig.*, C.A. 7988-CS (Del. Ch. Dec. 17, 2012) (TRANSCRIPT).

56